[Crim. No. 134. Second Appellate District.—November 12, 1909.]

## THE PEOPLE, Respondent, v. JOHN CYTY, Appellant.

CRIMINAL LAW—MURDER—CONVICTION OF MANSLAUGHTER—SELF-DEFENSE —CLAIM OF VERDICT FOR MURDER OR ACQUITTAL.—Where a defendant charged with murder relied upon self-defense, and was convicted of manslaughter, and there was evidence tending to show murder, and also to sustain the verdict rendered, the defendant, having been by the verdict acquitted of the charge of murder, cannot complain because the verdict was more favorable to him than the evidence warranted, and cannot urge that the verdict should have been either for murder or for acquittal.

ID.—VERDICT FOR LESS OFFENSE—QUESTION OF JUSTIFICATION—NEW TRIAL NOT WARRANTED.—Even though the verdict for the less offense may be contrary to the instructions of the court, and for a less offense than the evidence proves—it being for an offense included within the offense charged in the information—it must be carried out, and a new trial cannot be ordered for such reason alone.

ID.—EVIDENCE—DISPUTE OVER MINE—QUESTION AS TO POSSESSION OF TOOLS — ANSWER STRICKEN OUT — DEFENDANT NOT PREJUDICED.— Where the quarrel between deceased and defendant was over a mining claim, which defendant was working, and a witness for the prosecution was asked if he took possession of the tools when the dispute arose, and upon his replying in the negative was asked why not, to which he responded, "I wasn't ready to die," and the answer was stricken out on defendant's motion, he was not prejudiced thereby; and it cannot be inferred that the question was asked solely to impress the jury that the defendant was a violent and dangerous person, where the record does not justify such an inference.

ID.—IMPEACHMENT OF WITNESS — CONTRADICTION — IMMATERIAL TESTIMONY.—It is not error to disallow the impeachment of a witness by contradictory statements, when it appears that his testimony was immaterial.

ID.—ADMISSIBILITY OF DYING DECLARATIONS—CONSTRUCTION OF CODE— RES GESTAE.—Section 1870 of the Civil Code providing for the admissibility of the "act or declaration of a dying person, made under a sense of death, respecting the cause of his death," the evidence to be so admitted is construed to be restricted to the act of the killing, and the circumstances immediately attending and forming part of the *res gestae*, which embraces not only the actual facts of the assault and the circumstances surrounding it, but the matters immediately antecedent to and having a direct causal connection with the as-

sault, as well as acts immediately following the assault, and so connected with it as to form part of the occurrence.

ID.—MATTERS NOT PART OF THE RES GESTAE—NARRATION—SUSPICIONS AND EXPECTATIONS.—The dying declaration was never intended to embrace mere recitals or narrations of past events, or the suspicions of the deceased, nor his expectations of trouble with the defendant.

ID.—EVIDENCE AS TO EXPECTATION OF TROUBLE NOT OBJECTED TO—ABSENCE OF PREJUDICE.—Where no objection was interposed either to a question or the answer elicited that deceased declared that "he did not expect any trouble over the ground at all," and the answer was covered by previous declaration testified to without objection, that deceased declared that defendant shot him unexpectedly, the admission of such evidence that he expected no trouble was without prejudice to the defendant.

ID.—IMPROPER CROSS-EXAMINATION—PART OF DEFENDANT'S CASE.—It was not error to exclude improper cross-examination of a witness for the people, on matters as to which he had not testified in chief, and which related to matters which might be made part of the defendant's case.

ID.—SELF-DEFENSE—IMMINENT DANGER—RIGHT TO STAND GROUND—IMPROPER REFUSAL OF REQUESTED INSTRUCTION.—Where the defendant's evidence justified a requested instruction that "where one without fault is placed under circumstances sufficient to excite the fears of a reasonable person that another designs to commit a felony or some great bodily injury upon him, and to afford grounds for reasonable belief that there is imminent danger of the accomplishment of this design, he may, acting under these fears alone, slay his assailant and be justified by the appearances; and where the attack is sudden and the danger imminent, he may stand his ground and slay his aggressor, even though it may be proved that he might more easily have gained his safety by flight," it was ground of reversal to refuse such request.

APPEAL from a judgment of the Superior Court of Inyo County and from an order denying a new trial. John L. Childs, Judge presiding.

The facts are stated in the opinion of the court.

P. W. Forbes, and Wm. J. Clark, for Appellant.

U. S. Webb, Attorney General, and George Beebe, Deputy Attorney General, for Respondent.

TAGGART, J.—Appellant was informed against for the crime of murder, found guilty of manslaughter, and sentenced to imprisonment in the state prison for ten years.

It is contended in support of this appeal from the judgment and the order denying defendant a new trial that the evidence does not sustain the verdict, because the facts either establish murder or exonerate the defendant from the commission of any offense whatever; that the court erred in its rulings upon the admission and rejection of certain evidence specified; and that it also erred in giving certain instructions defining and relating to manslaughter and in relation to what acts upon the part of an assailant justify the taking of his life; also, that the court erred in refusing to give an instruction, requested by defendant, which declared the law relating to the right of a person assailed to stand his ground instead of retreating to avoid a conflict.

Appellant and the deceased, C. Kyle Smith, were miners and prospectors in Inyo county, between whom there had been disputes as to their respective rights in the mining claim upon which the defendant was working at the time of the killing, and as to the right of possession of certain miners' tools and appliances which defendant was using when he shot Smith. Smith was shot about 3 P. M. on November 21, 1908, and died at 9:30 o'clock the same night. Only Smith and defendant were present at the time of the shooting, but before Smith died he had a conversation with one Grant, who testified upon the trial to what Smith told him, and this was admitted as a dying declaration. In this statement the deceased said that "the Dago" (meaning defendant) shot him unexpectedly as he was going down the trail; that he was hit first in the back on the right hip. When told that he had hit defendant, he said he knew it; that he (Smith) was on the ground when he hit him and that defendant ran when he was hit. This statement was supported by the testimony of the physician who made a postmortem examination of the body of deceased. The physician testified that he had found a bullet wound on the back of the right hip, and also one in the back of one of deceased's thighs. In both instances the bullet passed upward and toward the front in its course, the former passing through the abdominal cavity. This corroborated the theory of the prosecution that Smith was traveling along a trail above the defendant when he was shot; it being the theory of the people that defendant lay in wait for the deceased in a cut or excavation below where he would pass along the trail.

The defendant testified upon his own behalf to the effect that he located the mine upon which he was working in May or June, 1904, that it bore no evidence of having been previously located, and that Smith posted notices and began work on the claim in 1906. On the morning of the tragedy defendant went to work in a cut on the claim, drilling, blasting and shoveling. A trail crossed above the face of the cut six, seven, or eight, or probably ten feet higher. The first he knew of Smith's presence that morning the latter, who was on the trail four or five steps away, spoke, saying, "What are you doing here?" and something else which defendant couldn't remember; "at that time he was on top, right on the cut where I throw the tools on that trail; I was right in the face of the cut." When defendant turned around toward him, he (Smith) "is yanking gun and pointing to me." Defendant made for the east wall of the cut to climb out, when he was shot in the arm; then he ran lengthwise of the cut to the dump (the cut was into the hillside), tumbled and fell on the dump, when Smith shot again, this time striking the defendant in the abdomen. While starting to run defendant tried to pull a magazine pistol which he carried in his pocket, but owing to his disabled arm had some difficulty in doing so, and when successful in this was still further delayed by the "safety," but finally succeeded in shooting, and (as described by him): "Then I begin to shoot. When I begin to shoot the ground gave out under my feet and I fall again, I begin falling on this side and I throw myself on this because this arm was sore; when I fall my gun fall off my hand. Of course I had been shooting and falling my gun get away from me, of course I tried to catch myself, throw myself on this side like this and the ground give out. I pick myself up and go get that gun back again. I never see Smith no more, never see him since." He further testified: "I did not know at the time I had hit him; I hurried to camp because I thought I was worse hurt than I was." The physician who dressed the defendant's wounds testified that there was a wound in the arm which was made by a bullet entering at the back and coming out at the front; also, that there was a crease across the defendant's abdomen, an abrasion of the skin.

We do not find the record entirely destitute of evidence upon which a verdict of manslaughter could be predicated, but in

11 Cal. App.—45

the consideration of the objection that the evidence shows either that the crime of murder has been committed or that the defendant is innocent, we may, for that purpose, assume that there is some evidence tending to establish that the defendant is guilty of murder. As the offense of manslaughter is necessarily included in the charge of murder, and a con-. viction of the crime of manslaughter is equivalent to a verdict of not guilty of the murder (*People* v. *Muhlner,* 115 Cal. 303, [47 Pac. 128]), the defendant cannot complain because the verdict is more favorable to him than the evidence warrants. (*People* v. *Coulter,* 145 Cal. 66, [78 Pac. 348].) Even though the verdict for the lesser offense be contrary to the instructions of the court, and for a less offense than the evidence proves—provided it be for an offense included in the charge in the information—it must be carried out, and a new trial cannot be ordered for such a reason alone. (*People* v. *Muhlner,* 115 Cal. 303, [47 Pac. 128], and cases cited.)

One of the witnesses for the people was asked on direct examination if he took the tools which were found near where defendant was working when the trouble began, and replied that he did not. Whereupon, over the objection of defendant, the prosecuting attorney was permitted to ask him, "Why didn't you?" and to which he replied, "I wasn't ready to die." This answer was, upon defendant's motion, stricken out, but it is contended that this did not cure the error, and that the answer was one expected by the counsel for the people, and was elicited for the purpose of creating the impression in the minds of the jurors that the defendant was a violent and dangerous person. We find nothing in the record to justify such an inference. The circumstances are entirely unlike those in *People* v. *Rodriguez,* 134 Cal. 142, [66 Pac. 174].

After the dying declaration of the deceased had been admitted in evidence, defendant sought to show on the cross-examination of one Kelly, a witness for the people, that when Kelly saw Smith after the shooting the latter was delirious. Upon Kelly testifying that it did not appear so to him, an attempt was made to lay the foundation to impeach Kelly by showing that he had made contradictory statements to other persons. The court sustained an objection to this and the ruling is assigned as error. It does not appear in any way from the evidence, or from any offer of proof made, that

the time referred to in these questions propounded to Kelly was the time at which the dying declaration was made to Grant. The latter testified without contradiction that he was alone with Smith at the time the statement was made, and we are unable to see the materiality of the evidence of Kelly which it was sought to impeach.

Rulings of the court assigned as Errors Nos. 3 to 7, and 9 to 14, inclusive, relate to the asking of questions by the prosecution, some of which were proper and others which, if material at all, were not prejudicial. The refusal to grant defendant's motion to strike out certain testimony, assigned as Error No. 8, was not prejudicial to the defendant. The answer desired stricken out bore upon the relations between the defendant and the deceased, and in so far as it affected the matter as to which it was material, if it were material at all, tended rather to sustain the view that the defendant intended merely to protect himself and his rights than to provoke trouble with the deceased.

Among the matters testified to in connection with the dying declaration was the following: The witness Grant was asked the question by the prosecuting attorney: "Did he [Smith] make any statement to you concerning his expectation of trouble?" This was objected to as calling for a self-serving declaration, and on the grounds that it was immaterial and irrelevant, not made in the presence of the defendant, and hearsay. The question was then withdrawn and the following propounded: "Q. Did he make any statement to you concerning whether he expected anything of that kind?" The same objections were interposed and overruled and an exception preserved by the defendant, and the witness answered: "He did." The witness was next asked: "What was that statement and in what connection was it made?" To this he replied: "He told me he didn't expect any trouble over the ground at all." No objection to this question was interposed, or motion to strike out the answer made, but when the next question was asked, to wit: "Did he make any statement to you as to how many times the defendant shot?" and this question answered, "Yes, sir," defendant asked to have the latter answer stricken out that he might interpose an objection, which motion was granted, and thereupon the objections which were made to the last question were overruled.

Section 1870, Code of Civil Procedure, which is the statutory provision as to dying declarations in this state, enumerates among the facts as to which evidence may be given upon a trial: "in criminal actions, the act or declaration of a dying person, made under a sense of impending death, *respecting the cause of his death.*" The evidence to be so admitted has been construed to be restricted to the act of the killing, and to the circumstances immediately attending it and forming a part of the *res gestae.* (*People* v. *Fong Ah Sing,* 64 Cal. 253, [28 Pac. 233].) While it is well settled that the *res gestae* embraces, not only the actual facts of the assault and the circumstances surrounding it, but the matters immediately antecedent to and having a direct causal connection with the assault, as well as acts immediately following the assault and so closely connected with it as to form a part of the occurrence (*People* v. *Cipolla,* 155 Cal. 224, [100 Pac. 252]), certainly it was never intended to embrace the recitals of past events or suspicions of the deceased, nor his expectations of trouble with the defendant. Accepting the rule as declared and conceding that it was error to permit the introduction of evidence of the character here under consideration, the question which elicited the answer as to the expectations of the deceased was not objected to, and no motion made to strike the answer out. The question which was objected to was a mere preliminary one. In addition to this, the matter objected to was practically covered by a previous answer of the same witness to the effect that Smith had told him that the defendant had shot him unexpectedly. This testimony was not objected to, and the matter was before the jury, irrespective of the ruling of the court upon the objection presented, and the ruling in this respect cannot be said to have been prejudicial to the defendant.

The assignments of error numbered 17 to 20 relate to the refusal of the court to permit the defendant to further cross-examine the witness Grant as to certain bloodstains upon the handles of a pick and shovel which the cross-examination disclosed the witness had seen on the morning after the trouble at the scene of the tragedy. The questions were not addressed to any matters as to which the witness had testified in his direct examination, and the rulings of the court were correct.

The matter might have been made a part of defendant's case, but was not cross-examination of this witness.

The instructions of the court defining manslaughter were properly given. The jury were not bound to accept as an entirety either the statement of the deceased or that of the defendant, but it was their duty to endeavor, from a consideration of all the evidence, to arrive at the true conditions of the shooting. Without reciting the testimony showing the relations of the defendant and deceased, from which the inference might be drawn that a quarrel arose in which either might have been the aggressor, we need only say in justification of these instructions that there was evidence upon which a verdict of manslaughter could have been predicated.

The giving of instructions Nos. 4 and 6 at the request of the people is assigned as error. The part of No. 4 material to the question before us reads: "The law of self-defense is founded on necessity, and in order to justify the taking of life upon this ground it must not only appear to the slayer, as a reasonable man, that he had reason to believe, and did believe, that he was in imminent danger of his life, or of receiving great bodily harm, but it must also appear to his comprehension, as a reasonable man, that to avoid such danger it was absolutely necessary for him to take the life of the deceased." No. 6 is substantially the same as instruction 4 considered and approved in *People* v. *Bruggy,* 93 Cal. 478, [29 Pac. 27], with this difference: The words supplied by the court by construction in the Bruggy case expressly appear in the instruction before us. Appellant contends that by the use of the words "absolutely necessary" in both of the instructions mentioned (4 and 6) the jury was impliedly instructed that the person assailed was forbidden to stand his ground if he could have found safety in flight, and that this is in contravention of the rule relative to retreat declared in *People* v. *Maughs,* 149 Cal. 253, 260, [86 Pac. 187].

Since the questions of law involved are practically the same, we may, in this connection, also consider the refusal of the court to give instruction No. 26, requested by the defendant. This instruction reads as follows: "Where one without fault is placed under circumstances sufficient to excite the fears of a reasonable person that another designs to commit a felony, or some great bodily injury upon him, and to afford

grounds for reasonable belief that there is imminent danger of the accomplishment of this design, he may, acting under these fears alone, slay his assailant, and be justified by the appearances; and where the attack is sudden and the danger imminent, he may stand his ground and slay his aggressor, even though it may be proved that he might more easily have gained his safety by flight." The attorney general finds no fault with this instruction as a declaration of the law, but contends that everything contained therein material to the defendant's case was embodied in instruction 27, given by the court. With this contention we cannot agree. Instruction 27 declares the law relative to the obligation of the person assailed to consider the question of retreat "while on his own property where he had a right to be," but No. 26 is not so limited.

If, in order to justify the taking of life in self-defense, it must appear to the person assailed, as a reasonable man, that it is absolutely necessary for him to take the life of his assailant to avoid losing his own life, or receiving great bodily harm, and the rule declared in No. 26, that "he may stand his ground and slay his aggressor, even though it may be proved that he might more easily have gained his safety by flight," is also the law, then the latter should be given in every case in which the facts require it in modification or explanation of the rule of "absolute necessity" stated in Nos. 4 and 6. Instruction No. 26 is apparently taken from *People* v. *Hecker*, 109 Cal. 451, 467, [42 Pac. 307, 312], and is in the language of that opinion, except in one respect not material here. In regard to the instruction considered in *People* v. *Bruggy*, it is said in the Hecker case: "Instruction E, which is complained of, has often been given and as often approved by this court. The cases in which it is discussed are reviewed in *People* v. *Bruggy*, 93 Cal. 476, [29 Pac. 26]. As was said by this court in *People* v. *Herbert*, 61 Cal. 544: 'To justify a homicide there must be a necessity, actual or apparent, and this we understand to be true under our statute as well as at common law.' Those cases where the assailed is not required to look to escape as an avenue of safety arise, as has been before discussed, where the peril is swift and imminent and the necessity of action immediate. Therein the law does not weigh in too nice scales the conduct of the assailed, and say he shall

not be justified because he might have resorted to other means to secure his safety. The suddenness of the attack puts him to the wall.'' After considering the contrariety of opinion among the authorities the court adds: ''So that while the killing must still be under an absolute necessity, actual or apparent, *as a matter of law* that absolute necessity is deemed to exist when an innocent person is placed in sudden jeopardy. The right to stand one's ground should form an element of the instructions upon the necessity of killing and the law of self-defense.''

It is apparent, then, that upon the theory that he was without fault the defendant was entitled to have instruction No. 26 given that the jury might be informed, *as a matter of law,* that, if he were without fault, and the suddenness of the attack put him to the wall, the ''absolute necessity'' required by instructions 4 and 6 had arisen. (*People* v. *Newcomer,* 118 Cal. 263, [50 Pac. 405].) He was also entitled to have the jury instructed as they were in No. 27. This instruction rested upon the common-law rule, which is the same as our statute, that a person attacked in his own house need retreat no further. (*People* v. *Lewis,* 117 Cal. 186, [59 Am. St. Rep. 167, 48 Pac. 1088].)

We do not think the Maughs case changes the rule as recognized above. What is said in that case upon this subject is rested upon the cases which we have cited and quoted from. The language of the instruction which was disapproved there was as follows: ''Before a person can justify taking the life of a human being on the ground of self-defense he must, when attacked, employ all reasonable means within his power, consistent with his safety, to avoid the danger and avert the necessity for the killing.'' The rule quoted from *People* v. *Hecker,* 109 Cal. 451, 467, [42 Pac. 307, 312], was recognized and is still the law of this state, and the trial court should have given instruction No. 26 requested by the defendant. On account of this error the judgment and order must be reversed.

Judgment and order appealed from reversed.

Allen, P. J., and Shaw, J., concurred.