[Crim. No. 1172. Second Appellate District, Division Two.—July 13, 1925.]

THE PEOPLE, Respondent, v. JOS. OROSCO, Appellant.

[1] CRIMINAL LAW—REFERENCE TO KILLING AS MURDER—PRESENCE OF JURY—ERROR.—In a prosecution for murder in which the defendant admitted the killing but pleaded self-defense, it was error for the trial court, after defendant's counsel had offered evidence concerning an event which occurred after the shooting of the deceased, in the presence of the jury and during the trial to refer to the killing as "the murder" by asking the question, "What is the use of taking up time with an episode that happened after the murder?" the jury having been later told by the court's instructions in effect that murder is a crime.

---

1. Remark of judge during trial of criminal case as comment on weight of evidence, note, 10 A. L. R. 1116. See, also, 8 Cal. Jur. 250.

[2] ID. — SELF-DEFENSE — EVIDENCE — REMARK OF TRIAL JUDGE. — In such prosecution, the remark of the trial judge, in permitting a stipulation that a witness unable to be present by reason of illness might be deemed to have testified to certain matters concerning an altercation between defendant and deceased which occurred about a year prior to the shooting, that the evidence was remote, was error, as such evidence, offered in support of the claim of self-defense, was admissible even if remote in point of time, the remoteness thereof affecting its weight and not its admissibility.

[3] ID.—EVIDENCE—PREJUDICIAL REMARKS.—In such prosecution, remarks by the trial judge, made while defendant was endeavoring to show by a witness, with whom he lived, the circumstances under which defendant's coat (which had been cut by the deceased in a poolroom altercation with defendant about a year prior to the killing and which was produced at the trial) had been preserved, to the effect that it was a waste of time in taking evidence concerning the coat, so far as he could tell, and that "we are going far afield on this thing," were erroneous and prejudicial.

[4] ID.—EVIDENCE—HARMLESS STATEMENT BY JUDGE.—In such prosecution, a statement by the trial judge that "There isn't any appearance of a contradiction yet in the coroner's inquest, because you haven't proven the coroner's inquest yet," made after the defendant had shown that a witness, who testified at the trial that he saw the defendant rise from a bench upon the arrival of the deceased, had testified at the coroner's inquest that he could not point out the man who arose from the bench, was harmless, where it was in fact defendant who arose from the bench, and there was no controversy in the case as to who fired the fatal shot.

[5] ID.—IMPEACHMENT—AUTHENTICITY OF CORONER'S TRANSCRIPT.—In such prosecution, the defendant, in attempting to impeach certain witnesses for the prosecution by showing that they had given testimony at the coroner's inquest contradictory of that given on the trial, had the right to read the questions put to and the answers given by them at the coroner's inquest, and ask if they had not so testified, without first showing that the transcript of the proceedings at the coroner's inquest was authentic; and the fact that something improper, if the authenticity of the transcript be not shown, might get before the jury does not cut off such right.

[6] ID.—ALLEGED CONTRADICTORY WRITTEN STATEMENTS—SECTION 2052, CODE OF CIVIL PROCEDURE—CONSTRUCTION.—Under section 2052 of

2. See 13 *Cal. Jur.* 696; 13 R. C. L. 912.

6. Laying foundation for impeachment, notes, 73 **Am. Dec.** 767; 41 L. R. A. (N. S.) 914. See, also, 28 R. C. L. 636.

the Code of Civil Procedure, even when the alleged contradictory statements of a witness are in writing, the circumstances of time, place and parties present must be stated to the witness, and, logically, they must be stated before the writing is shown.

[7] ID.—IMPROPER REMARKS CONCERNING PRACTICES OF DEFENDANT'S COUNSEL—EFFECT UPON DEFENSE.—In such prosecution, the trial judge injured materially the defense of the defendant by remarks the effect of which was to hold defendant's counsel up to the jury as one who, in an endeavor to win his cause would resort to iniquitous practices, where the remarks were made in connection with the course being taken by defendant's counsel in the impeachment of certain witnesses for the prosecution, and the course so taken was a proper one.

[8] ID.—INTOXICATION—EVIDENCE.—In such prosecution, the trial court did not err in sustaining an objection to a question asked by defendant of deceased's wife whether deceased was in the habit of drinking intoxicating liquor, where the trial court had no knowledge, when the question was put to the wife, that defendant had ever had trouble with the deceased when the latter was in a state of intoxication, or that defendant knew anything about the habits of deceased in that regard; and, for the same reason, the trial court did not err in refusing to permit the jury to smell the contents of a bottle taken from the clothing of the deceased soon after his death in order to determine whether it held an intoxicating liquor.

[9] ID.—CONSPIRACY—EVIDENCE.—In such prosecution, the offer of the defense to prove that an automobile, which certain bystanders boarded for the purpose of notifying the police of the killing, was stoned, as it left the scene of the homicide, by those persons who had come with deceased to the scene of his death, which offer was made on the theory that deceased and his friends had come to the place of the homicide for the purpose of taking the life of defendant, was properly rejected.

[10] ID.—SELF-DEFENSE—INSTRUCTIONS.—In such prosecution, it was error to refuse to give defendant's requested instruction containing the statement "that a person in the exercise of the right of self-defense . . . not only has a right to stand his ground and defend himself when attacked, but he may pursue his adversary until he has secured himself from danger"; and the language in another instruction given by the court that, in the exercise of the right of self-defense, the party assailed has "the right to repel force by force," and that he may employ the right to defend himself from the apprehended danger "to any extent which to

10. See 13 Cal. Jur. 635.

him is apparently necessary, acting in a reasonable manner," did not cover the point stated in the refused instruction.

[11] ID.—PRIOR RELATIONS BETWEEN DECEASED AND DEFENDANT—EVIDENCE—INSTRUCTION.—In such prosecution, the refusal to give defendant's requested instruction to the effect that the "jury may take into consideration the evidence of the previous difficulties between" deceased and the defendant "and likewise any other matters pertaining to their prior relations which have been introduced in evidence for the purpose of determining their state of mind at the time the fatal shot was fired," was error, where such an instruction was called for by the testimony, and the court gave no instruction upon the subject.

[12] ID.—REPUTATION—INSTRUCTIONS.—In such prosecution, the trial court erred in not giving a requested instruction that "evidence of the good character of the defendant comes in aid of the general presumption of innocence and is no more to be laid aside by the jury in their deliberations than is the general presumption itself. It is a fact in the case and itself may, in connection with all the other evidence in the case generate a reasonable doubt, sufficient to entitle the defendant to an acquittal," or another requested instruction to the same legal effect, where evidence had been introduced to the effect that defendant's reputation for peace and quiet was good.

[13] ID.—BASIS OF LAW OF SELF-DEFENSE—INSTRUCTION.—On such prosecution, a given instruction that the "law of self-defense is founded on necessity, and in order to justify the taking of life upon this ground it must not only ·appear to the slayer, as a reasonable man, that he had reason to believe, and did believe, that he was in danger of his life, or of receiving great bodily harm, but it must also appear to his comprehension, as a reasonable man, that to avoid such danger it was absolutely necessary for him to take the life of the deceased," was correct.

[14] ID. — WHEN PLEA OF SELF-DEFENSE NOT AVAILABLE — INSTRUCTION.—An instruction "that self-defense is not available as a plea to a defendant who has sought a quarrel with the design to force a deadly issue and thus, through his fraud, contrivance or fault to create a real or apparent necessity for killing," while a correct statement of an abstract proposition of law, was improperly given in the present prosecution for the reason that there was not in the record the slightest evidence that defendant sought a quarrel with the deceased during the series of events leading up to the latter's death.

---

13.   See 13 Cal. Jur. 636.
14.   See 13 Cal. Jur. 644.

[15] ID. — DAMAGING COMMENT — ADMONITORY INSTRUCTION — TIME.—
Where a judge makes damaging comment in the presence of the
jury during a trial, or where a district attorney takes a course
which has a like effect, it is the duty of the counsel for the in-
jured party to give the judge an opportunity to obviate the
possibility of harm by means of admonition addressed to the
jury, if the misconduct of either judge or district attorney is
such that its effect may be removed by admonition; and a
request for the insertion of such an admonition in the final instruc-
tions to be given to the jury is not so untimely as to justify
a judge in refusing to grant it.

[16] ID.—REFUSAL TO GIVE ADMONITORY INSTRUCTIONS—ERROR.—In
such prosecution, the refusal of the trial court to give either one
or the other of two instructions (which the defendant requested
the court to give in its final instructions to the jury), telling the
jury, in effect, that they were not to infer from certain remarks
made by the judge during the trial that the latter intended to
reflect any discredit upon defendant's counsel or upon the de-
fendant himself, nor infer that the judge had any opinion regard-
ing any of the facts of the case, and that they, the jury, were
the sole and exclusive judges of the facts, was error.

[17] ID.—EVIDENCE—ERRORS—JUDGMENT—APPEAL.—In such prosecu-
tion, in view of the evidence and the errors which occurred during
the trial, the judgment of conviction is reversed.

---

(1) 16 C. J., p. 827, n. 14, p. 833, n. 85.    (2) 16 C. J., p. 833,
n. 85, 94.    (3) 16 C. J., p. 833, n. 85, 94.    (4) 17 C. J., p. 295,
n. 63.    (5) 40 Cyc., p. 2729, n. 62, p. 2730, n. 64, p. 2732, n. 76,
p. 2735, n. 92 New.    (6) 40 Cyc., p. 2735, n. 92.    (7) 16 C. J.,
p. 830, n. 38; 17 C. J., p. 297, n. 3.    (8) 30 C. J., p. 174, n. 15.
(9) 30 C. J., p. 204, n. 84.    (10) 16 C. J., p. 1069, n. 12; 30 C. J.,
p. 368, n. 16, p. 386, n. 21.    (11) 16 C. J., p. 1069, n. 12; 30 C. J.,
p. 368, n. 15.    (12) 16 C. J., p. 982, n. 2, p. 1069, n. 12.    (13) 30
C. J., p. 45, n. 65, p. 60, n. 79, p. 61, n. 4, p. 376, n. 66, p. 378, n. 74.
(14) 30 C. J., p. 375, n. 57.    (15) 16 C. J., p. 836, n. 34, p. 915,
n. 14.    (16) 16 C. J., p. 828, n. 27.    (17) 17 C. J., p. 369, n. 6.

APPEAL from a judgment of the Superior Court of Los
Angeles County. Edwin F. Hahn, Judge. Reversed.

The facts are stated in the opinion of the court.

Wm. T. Aggeler, Public Defender, G. A. Benedict, Deputy
Public Defender, for Appellant.

U. S. Webb, Attorney-General, John W. Maltman and John L. Flynn, Deputies Attorney-General, for Respondent.

WORKS, J.—Defendant was charged with the murder of one Nicolas Rios by shooting. He admitted the killing, but contended that the act was done in self-defense. He was convicted of murder in the second degree and appeals from the judgment of conviction.

[1] The first point made by appellant for a reversal of the judgment is that the trial judge, in the presence of the jury and during the trial, referred to the killing of Rios as "the murder." It is contended that the remark tended to prejudice the rights of appellant in the minds of the jurors. The use of the word to which objection is made came about in this manner: Appellant's counsel had offered evidence concerning an event which occurred after the shooting of Rios, whereupon the judge, without objection having been made by opposing counsel, asked the question: "What is the use of taking up time with an episode that happened after the murder?" In discussing the point thus presented by the record appellant cites a long list of cases to the proposition that the presiding judge in a criminal case should not, directly or indirectly, assume or hypothetically suggest the guilt of the defendant. Particular reliance is placed on *People* v. *Williams*, 17 Cal. 142. That was a murder case, and during his charge to the jury the trial judge referred to the person who had been slain as "his victim," that is, as the victim of the defendant on trial. The supreme court said: "We are not disposed to criticize language very closely in order to reverse a judgment of this sort, but it is apparent that in a case of conflicting proof, even an equivocal expression coming from the Judge, may be fatal to the prisoner. When the deceased is referred to as 'a victim,' the impression is naturally created that some unlawful power or dominion had been exerted over his person. And it was nearly equivalent, in effect, to an expression characterizing the defendant as a criminal. The Court should not, directly or indirectly, assume the guilt of the accused, nor employ equivocal phrases which may leave such an impression. The experience of every lawyer shows the readiness with which a jury frequently catch at

intimations of the Court, and the great deference which they pay to the opinions and suggestions of the presiding Judge, especially in a closely balanced case, when they can thus shift the responsibility of a decision of the issue from themselves to the Court. A word, a look, or a tone may sometimes, in such cases, be of great or even controlling influence. A Judge cannot be too cautious in a criminal trial in avoiding all interference with the conclusions of the jury upon the facts; for of this matter, under our system, they are the exclusive judges." We are convinced that the use of the word "murder" by the judge in the present case comes within the condemnation embraced in this language, although, in our opinion, the word was not as objectionable as the one with which fault is found in the opinion from which quotation is made. There is room for the supposition here that the jury understood at the time that the judge intended by the use of the objectionable word merely to refer to the killing, and that appellant killed Rios is admitted. The possibility of such a supposition is minimized, however, by the fact that, as a matter of course, the judge told the jury in his final instructions, in effect, that murder is a crime. The jury was therefore notified of the difference between a murder and a killing, and it is quite likely that in the last analysis the judge's use of the word to which objection is made left an impression unfavorable to appellant in the minds of the members of the trial body. It appears, then, that the word should not have been used and that its employment was error. This untoward circumstance, standing alone, is not of great moment, and it is given such extended notice principally because the judge, throughout the trial, let fall other expressions which could not but have been injurious, each in some degree, either lesser or greater, to the rights of appellant. This occurrence was but one of a chain of events of a similar character, and as such it is to be considered when we come to view, as we must, the various errors of the court in applying to the cause the provisions of section 4½ of article VI of the constitution. Respondent points out that no exception was taken at the time to the trial judge's use of the word "murder," and no admonition was asked to be given to the jury concerning it. This circumstance will be considered when we later pass

upon the action of the judge in refusing certain instructions asked by appellant.

[2] A part of appellant's claim at the trial that the killing of Rios was in self-defense lay in evidence concerning a difficulty between him and Rios which occurred about a year prior to the shooting. According to this testimony Rios, on the occasion mentioned and while he was in an intoxicated condition, made a vicious assault upon appellant in a certain poolroom. The person of appellant was uninjured during the assault, except for a slight cut on the head, but a coat worn by him was slashed in several places by means of a knife or dagger in the hands of Rios, so much so that it was unfit for further use. It was stipulated in writing during the trial that a certain person who was confined to his bed by illness and who was therefore unable to be present in court as a witness might be deemed to have testified to certain matters concerning this poolroom altercation. When the stipulation was offered in evidence objection was made to it by the district attorney. In ruling upon the objection the trial judge said: "Well, I think it is remote, but I am going to overrule the objection. I will permit it to be read to the jury." It is contended that the judge's remark that the evidence was remote was error, and the point is well taken. It is settled that evidence of the character now under discussion, offered for the purpose for which this was offered, is admissible even if remote in point of time; in short, that the objection that it is remote goes to its weight and not to its admissibility (*People* v. *Brown,* 76 Cal. 573 [18 Pac. 678]; *People* v. *Wilson,* 23 Cal. App. 513 [138 Pac. 971]). The remark of the judge to which exception is taken was therefore an invasion of the province of the jury, as that body is the sole judge of the weight of evidence. Here, again, as in the instance of the point of which we have above made disposition, respondent calls attention to the fact that at the immediate time of the court's remark no objection was made and no admonition to the jury was asked. This circumstance will later be considered.

[3] Still having in mind the poolroom episode, the mutilated coat was produced at the trial and was received in evidence. It came from the custody of one Serra and his wife, with whom appellant lived at the time of the occurrence. There was testimony that appellant at the time came

home with the slashed garment on, and Serra testified that
he then took the coat from appellant. The record then
shows this: "Q. Now, what did you mean when you said you
took the coat away from Orosco? The Court: I don't think
I would spend any more time on that coat. I don't think
he saw the cuts that were made. Mr. Fulcher [counsel for
defendant]: We will connect it up. The Court: So far I
think it has been a waste of time, all about the coat, so far
as I can tell. Mr. Fulcher: We will show, of course— The
Court: If you can show by somebody who saw it. He didn't
see the cuts made. Mr. Fulcher: We were identifying it
as Orosco's coat. The Court: Well, Orosco must have told
him it was his coat. How does he know? Mr. Fulcher: If
he saw it on him. He testified he saw it on him. The
Court: We are going far afield on this thing. I expected
he would know something as to the cuts made." The re-
marks of the judge shown by this excerpt from the record
were erroneous and prejudicial. It was most material for
appellant to explain how the damaged garment had been
preserved for a year, instead of having been consigned to
the limbo of discarded clothing, and how, after that length
of time, he was able to produce it at the trial. The testi-
mony of Serra tended to make clear this circumstance, which
otherwise would have perplexed the jury. The remarks of the
judge must have materially interfered with this clearing-up
process. Moreover, certain of his observations tended to
discredit in the eyes of the members of the jury the entire
poolroom episode as an item in the defense of appellant that
the homicide was justifiable. These particular remarks were:
"So far I think it has been a waste of time, all about the
coat, so far as I can tell. . . . We are going far afield on
this thing." These observations of the judge made a sub-
stantial addition to his remark that the poolroom occurrence
was remote. Here again, as in the case of the points al-
ready discussed, appellant at the time took no exception to
the comments of the judge and asked no admonition to the
jury concerning them.

[4] During the trial appellant's counsel sought to lay
a foundation for the impeachment of a certain witness for
the prosecution. He asked the witness if he testified at the
coroner's inquest held over the body of Rios and the answer
was in the affirmative. He then asked if the witness had

given certain answers to questions propounded to him at the inquest and if the questions were answered. Then the following occurred: "Mr. Fulcher: Now, your Honor, I have some more cumulative matter along exactly the same line, at the preliminary hearing. The Court: You mean for impeachment? Mr. Fulcher: For the same purpose. It is cumulative of the coroner's inquest; in other words, it contradicts his testimony here. The Court: There isn't any appearance of a contradiction yet in the coroner's inquest, because you haven't proven the coroner's inquest yet." It is contended that this statement of the judge was error, and in order to state the point completely it becomes necessary to refer further to the record. The witness on the stand had accompanied Rios to the place where the latter met his death at the hands of appellant. When they arrived appellant was seated on a certain bench, and immediately upon the arrival the life of Rios was taken. The witness testified on his direct examination that as he and Rios and others approached he saw appellant seated on the bench and that he saw him "get up" from it. On cross-examination the witness was asked if a certain question was put to him at the coroner's inquest and if he gave a certain answer to it. The following were the question and answer: "Q. Point out the man who done the shooting in the room. A. I can't point him out because I couldn't see him in the dark, I know it was a person who got up." As to whether he had so testified the witness answered: "Maybe I did, if it is written there." This matter in the record closely precedes the statement of the judge to which exception is taken, and the statement referred in part to it. We need not decide, however, whether the remark of the judge was erroneous, as it related to what turned out, upon the presentation of the evidence for the defense, to be an immaterial circumstance. It was in fact appellant who arose from the bench. Moreover, it transpired that there was to be no controversy in the case as to who fired the fatal shot. As the remark of the judge could have affected a determination of that question alone, the error committed by him, if error there was, harmed appellant not at all. The fact that the evidence for the defense was devoted solely to a showing that appellant shot Rios in self-defense rendered innocuous any harm which might otherwise have lurked in the comment of the court.

[5] Other unfortunate occurrences arose through attempts of appellant's counsel to impeach witnesses by showing statements made by them at the coroner's inquest which were claimed to be contradictory of their testimony at the trial. These occurrences, three or four in number, were of a similar character and will be treated together. The following transpired when one of the witnesses for the prosecution was under cross-examination: "Q. I want to show you a part of your testimony, page 16 of the Coroner's inquest, beginning at line 1. The question to which he gives the answer is on page 15, at line 30, and I ask you if you so testified at the Coroner's inquest. The Court: Ask him first if he recollects testifying at the Coroner's inquest. A. Some of the words I remember testifying, and then others I don't remember. . . . Q. Do you remember testifying at the Coroner's inquest, over the body of Nick Rios, at the day and date given on the front of that. A. Yes. . . . Mr. Ryan [a deputy district attorney]: Is this for the purpose of impeachment? Mr. Fulcher: It certainly is." The district attorney then made the objection that "it is not impeachment, and if it be impeachment it is impeachment upon a collateral matter, and . . . that there is no evidence that this is a true and accurate copy of the Coroner's inquest." Then came this: "The Court: He says part of it he remembers and part of it he does not remember. Until you have shown this is an authentic copy— Mr. Fulcher: Your Honor, I think impeachment by the Coroner's inquest is the same as impeachment by any other oral person. The Court: No, except word for word. He says these things he does not remember. You undertook to read word for word. You cannot read it until you prove he did say it. Mr. Fulcher: My contention is this, I have a right to ask him if he did so testify, giving him the exact words. The Court: You have. Nobody objected to that. Mr. Fulcher: I haven't been permitted to ask him that. There is nothing in the record to show what the question is on which the ruling is made . . . The Court: Will you indicate the line on this page that you want for the record, and then I will read them. Mr. Fulcher: If I find an authority on that, will your honor consider it, on the question of reading the transcript? The Court: If you can find it. It is bad practice. It has been, as I understand the authority, not to read a

transcript to the jury and have it afterwards held to be of
no effect, unless it is reversible error, and I won't allow it.
If it is reversible error, I will.   I think it is such an in-
iquitous practice, until the Supreme Court say so, I will not
do it. . . . I will not let it go to the jury and then afterwards
rule it is immaterial, and should not go to the jury, and
waste the time of the court, and in my opinion it is prejudi-
cial.''   After a further colloquy between the judge and Mr.
Fulcher, the following transpired: ''The Court: I will per-
mit you to ask the question, beginning line 30, the bottom
of page 15. . . . You had better ask him if he remembers
that particular part, but I take it that is what you wanted
to show.   I will permit you to read the whole of it. . . .
Mr. Ryan: What about my . . . objection on the ground
this transcript has not been shown to be authentic?   The
Court: He can ask whether at a certain time he made a
certain statement, irrespective of the transcript.   That is,
I understand, what he proposes to do now.   Mr. Fulcher:
That is the purpose, your Honor.   Q. Now, I will ask you
if the following question was put to you at the Coroner's
inquest'': The assumed question was then stated, and further
queries concerning alleged questions put and answers made
at the inquest were propounded to the witness.   A somewhat
similar chain of circumstances presented itself when another
witness for the prosecution was under cross-examination.
It was sought to impeach the witness by showing that he
had made at the coroner's inquest statements contradictory
of testimony given by him on direct examination at the trial,
and several questions had been put to him for the purpose
of laying a foundation for the impeachment.   Then: ''Mr.
Ryan: At this time I move all the questions and answers be
stricken from the record until it is shown this testimony
was taken at the coroner's inquest.   Mr. Fulcher: That is
a matter of proof on the part of the defendant, proving the
remainder of our case.   If he says he don't know whether
he testified or not, we will prove he did so testify.   The
Court: The question shows the iniquity of that method, be-
cause it does not appear here you will show it.   Mr. Fulcher:
If we don't prove it— The Court: I understand, but it
has gone before the jury.''

The attitude of the judge upon the legal question involved
in these quotations from the record was incorrect.   The

counsel was following exactly the course required when an attempt is made to impeach a witness by showing that he has made statements out of court which are contradictory of his testimony given in court. . Section 2052 of the Code of Civil Procedure reads: "A witness may . . . be impeached by evidence that he has made, at other times, statements inconsistent with his present testimony; but before this can be done the statements must be related to him, with the circumstances of times, places, and persons present, and he must be asked whether he made such statements, and if so, allowed to explain them. If the statements be in writing, they must be shown to the witness before any question is put to him concerning them." The decided cases do not add to the requirements of this section the rule that alleged contradictory statements which are in writing must be proven to be "authentic" before they can be shown to the witness who is sought to be impeached, nor do we think that reason requires such a step. In all instances, under the mandate of section 2052, before an attempted impeachment may be made complete, the witness sought to be impeached must be made acquainted "with the circumstances of times, places, and persons present" when it is claimed the contradictory statements were made, and they must be "related" to him. So far the requirements of the section may be said to be general. After this general provision the legislature has added the special requirement that if the "statements be in writing, they must be shown to the witness before any question is put to him concerning them." This special mandate of the section is not operative until the general requirement is complied with. [6] That is, even when the alleged statements are in writing, the circumstances of time, place and parties present must be stated to the witness, and, logically, they must be stated before the writing is shown. After that is done, the special provision of the section operates, and the witness, having been made acquainted with the circumstances of time, place and persons present, and having seen the alleged contradictory statements on paper, may be asked whether he made them. This is all that the statute by its letter requires, and the witness has had before him everything that in fairness could be required for the purpose of refreshing his recollection and putting him on his guard. He is fully armed and warned. Whether or not the tran-

script which is presented to him is "authentic" is not neces-
sary to his enlightenment. Certain definite statements are
presented to him, with all the circumstances under which it
is claimed that they were made, and he is given fair oppor-
tunity to say, at his peril, it is true, whether he made them.
If he says he did not, the very statements which have been
exhibited to him must be proven in substance, either by a
showing that the transcript of his statements is "authentic,"
that is, that a stenographer was in attendance when he made
the statements and that he was accurately reported, or by
the testimony of those who were present at the time. We
are convinced that if a court should require that the authen-
ticity of the transcript be proven in advance of the time
when the witness is impeached, the requirement would be an
addition to the statute and not a construction of it and would
be a work of judicial legislation.

In connection with what has been said above it is to be
observed that the trial judge in the present instance did not
take the view that the "authenticity" of the transcript of
the testimony before the coroner must be shown in order to
enlighten the witness in view of his threatened impeachment.
The judge took the ground that if the transcript were not so
supported something improper might get before the jury.
That position was untenable. The danger which the judge
feared is one which is incident to every attempt to impeach
a witness by showing statements out of court which contra-
dict his testimony. Under what we have termed the general
provision of section 2052, any oral contradictory statement
claimed to have been made by a witness must be recited to
him, and his answer must be obtained as to whether he made
it, before others may testify concerning it. The only relief
from the danger apprehended by the judge, whether the as-
serted contradictory statements are oral or written, is to
remove their injurious effect, if there be any, by admonition
and instruction in the event that there is in the last analysis
no evidence that they were made.

As we have already remarked, there is no authority for the
position taken by the trial judge on the subject now under
examination. There are a number of cases in which the
question arose as to whether a sufficient foundation was
laid for an impeachment by means of contradictory state-
ments made at preliminary examinations. In them the rule

73 Cal. App.—38

o

directly prescribed by section 2052 is stated and nothing more; that is, it is said that before a witness may be impeached the alleged contradictory statements must be shown or read to him (*People* v. *Ching Hing Chang,* 74 Cal. 389 [16 Pac. 201]; *People* v. *Dillwood,* 4 Cal. Unrep. 973 [39 Pac. 438]; *People* v. *Hawley,* 111 Cal. 78 [43 Pac. 404]; *People* v. *Lambert,* 120 Cal. 170 [52 Pac. 307]). Of course, as indicated in one of these opinions, that in *People* v. *Hawley,* the authenticity and correctness of the transcript must be shown before it may be used for the final purpose of impeaching the witness. The sufficiency of the foundation for impeachment has arisen in cases in which the alleged impeaching statements were made at previous trials of the cause in which the witnesses later testified, and in those cases also only the rule expressly stated in section 2052 is set forth (*People* v. *Lee Chuck,* 78 Cal. 317 [20 Pac. 719]; *Doudell* v. *Shoo,* 20 Cal. App. 424 [129 Pac. 478]; *People* v. *Fitzgerald,* 138 Cal. 39 [70 Pac. 1014]; and statements made in an unsigned deposition have been put in the same category by another decision (*Lanigan* v. *Neely,* 4 Cal. App. 760 [89 Pac. 441]). As far as we are able to discover, questions touching impeachment where the alleged contradictory statements are made at a coroner's inquest have been considered in this state but once (*People* v. *Devine,* 44 Cal. 452), and it seems to appear from the report of the case that the transcript of the proceedings at the inquest was not shown to the witness who was sought to be impeached, as it is said that she was "asked" whether she had made the alleged contradictory statements. The decision turned upon the question whether the transcript contained a report of a proceeding judicial in character and therefore admissible for the purpose of impeaching the witness, due foundation having been laid. The supreme court decided that it was such a report and reversed the judgment for the reason that the trial court had excluded the transcript. If this decision has not been overturned, as to the exact point determined by it, by *Mar Shee* v. *Maryland Assurance Corp.,* 190 Cal. 1 [210 Pac. 269], a transcript of the proceedings at a coroner's inquest would seem to be governed by the provisions of section 2052, like a transcript of proceedings at a preliminary examination, but if it has been overruled by the

late case noted, it is possible that such a transcript is not to be viewed as containing statements "in writing" of the witness testifying at the inquest, as that term is used in the special provision contained in section 2052. It has been held in one case that a statement made by one to the police and by the latter reduced to writing is not a statement "in writing" under the section, of the party who makes the statement (*People* v. *Glaze*, 139 Cal. 154 [72 Pac. 965]. See, also, *People* v. *Talman*, 26 Cal. App. 348 [146 Pac. 1063]). If the statements made at the inquest here were not statements in writing, as that term is employed in the section, they need not have been "shown" to the witnesses whose impeachment was desired, and it would have been sufficient, of course, merely to have asked whether the statements were made. While the exact question which we now discuss has never been decided in this state, the procedure which we have above outlined as being proper seems actually to have been followed in *People* v. *Morine*, 61 Cal. 367, a case in which the alleged contradictory statements were made at an earlier trial of the cause in which the impeached witness was on the stand. After an "effort had been made by the defense to impeach the witness . . . by showing that he had testified on a former trial of this case to a state of facts different from that stated by him on the second trial," and while the evidence of the defendant was being produced, the reporter who had been in attendance at the first trial was placed on the stand, it was shown by him that his transcript of that trial was "authentic," and he testified to the making of the contradictory statements. We are satisfied that the attitude of the trial judge here in making his remarks concerning the practice followed by appellant's counsel was based upon an incorrect understanding of the law.

We have not discussed the legal question arising under section 2052 for the purpose of imputing error to the trial court in any ruling which he made involving it. No such error is claimed. It appears that appellant at last succeeded in getting before the witnesses the various questions he desired to propound to them through the expedient, apparently devised by the judge, of "asking" them, but not "word for word" from the alleged record, whether they had made the asserted contradictory statements. [7] It is contended, however, that the judge erred in saying in the

presence of the jury concerning the course being taken by appellant's counsel, that "It is bad practice," that "it is such an iniquitous practice," that "it is prejudicial," and that a question asked by counsel "shows the iniquity of that method." These expressions, strong as they were, would have been of doubtful propriety if the judge had been correct in his view of the law, and if it had become necessary for him to halt counsel in the course he attempted to take, albeit by remarks of a more temperate character. We have been at pains to examine the question of law which counsel and judge debated, upon the theory that the error of the latter was the greater if he were wrong in his view of the law and if counsel were right. We are satisfied that the judge injured materially the defense of appellant by the character of rebuke he administered, when not even a mild rebuke was deserved. He held appellant's counsel up to the jury as one who, in an endeavor to win his cause, would resort to iniquitous practices. In fact, he in effect accused the counsel of pettifogging, and he accused him unjustly. His course must have lessened appellant's chances of acquittal. It is to be observed here, again, that no exception was taken to the remarks of the court at the time they were made and that no admonition was asked concerning them.

[8] The widow of Rios testified for the prosecution. On her cross-examination she was shown a half-pint bottle containing a white or yellowish fluid and was asked whether she had seen it in her husband's possession when he left home immediately preceding his death. She replied that she had not. She was then asked whether Rios was in the habit of drinking intoxicating liquor. An objection to the question was interposed and the objection was sustained. It is contended that the ruling was error. This occurrence was at a stage of the trial which preceded what we have above termed the poolroom episode, during which, it will be remembered, Rios, while intoxicated, had made a vicious assault upon appellant. The court had no knowledge, when the question was put to Mrs. Rios, that appellant had ever had trouble with the deceased when the latter was in a state of intoxication, or that he knew anything about the habits of deceased in that regard. Whether the question put to Mrs. Rios would have been proper if it had come after the evidence concerning the trouble in the poolroom, under the

rule stated in slightly varying forms in *People* v. *Lamar,*
148 Cal. 564 [83 Pac. 993], *People* v. *Bennett,* 161 Cal. 214
[118 Pac. 710], and *People* v. *Barrett,* 22 Cal. App. 780
[136 Pac. 520], we need not pause to decide. The question
having been propounded at the early stage of the trial which
brought it forth and without intimation that there would
be any evidence showing appellant's knowledge concerning
the alleged habits of Rios, we are satisfied that the trial court
did not err in sustaining the objection to it.

At a later period of the trial it was shown that the bottle
which had been exhibited to Mrs. Rios was taken from the
clothing of Rios when, soon after his death, his body was
lifted into a conveyance for transport from the scene of the
homicide. The bottle and its contents were offered and re-
ceived in evidence. Appellant then asked that the members
of the jury be permitted to smell the contents of the bottle
in order to determine whether it held an intoxicating liquor
and the permission was refused. Laying aside points made
by respondent as justifying the refusal, we think the court
did not err in making it, for the reasons stated in the last
preceding paragraph. At the time of the request a part
of the evidence concerning the poolroom affair had been in-
troduced, it is true, but there was at that stage of the trial
no hint that Rios had made the assault upon that occasion
while he was intoxicated, nor was the court notified in any
other manner that appellant knew anything whatever as to
the alleged habits of Rios in the use of intoxicants.

[9] Immediately after Rios was killed certain of the by-
standers got into an automobile and started toward a tele-
phone for the purpose of notifying the police of the occur-
rence. The defense offered to prove that the automobile was
stoned, as it left the place, by those persons who had come
with Rios to the scene of his death. Upon objection the
offer was rejected. It was the theory of the defense that
Rios and his friends had come to the place for the purpose of
taking the life of appellant. It is contended that the re-
jected evidence was admissible in proof of the alleged con-
spiracy. In our opinion it was not.

Appellant requested several instructions on the law of
self-defense. They were refused on the ground that the
matter presented by them was covered by instructions which
were given. We have read the instructions which the court

gave upon the subject and we are satisfied that all but two of the requested instructions were properly rejected for the reason stated. We shall therefore proceed to a specific consideration of those two alone.

[10] One of the rejected instructions contained the statement "that a person in the exercise of the right of self-defense . . . not only has a right to stand his ground and defend himself when attacked, but he may pursue his adversary until he has secured himself from danger." This requested instruction, like others on the same general subject, was denied on the ground that its matter was covered by instructions which were given. We find in the record no instruction in which the substance of the language above quoted was presented to the jury. Respondent calls our attention to an instruction which recited that; in the exercise of the right of self-defense, the party assailed has "the right to repel force by force," and that he may employ the right to defend himself from the apprehended danger "to any extent which to him is apparently necessary, acting in a reasonable manner." The language thus given did not, to our minds, cover the point. The refusal to give the requested language was therefore error. "The right to stand one's ground should form an element of the instructions upon the necessity of killing and the law of self-defense" (*People* v. *Hecker,* 109 Cal. 451 [30 L. R. A. 403, 42 Pac. 307]). "[W]hen a man without fault himself is suddenly attacked in a way that puts his life or bodily safety at imminent hazard, he is not compelled to fly or to consider the proposition of flying, but may stand his ground and defend himself to the extent of taking the life of the assailant, if that be reasonably necessary" (*People* v. *Newcomer,* 118 Cal. 263 [50 Pac. 405]). The requested instruction was peculiarly applicable in the present instance, as it fitted exactly certain phases of the testimony in the case.

[11] One of the instructions which was requested and refused read as follows: "The jury may take into consideration the evidence of the previous difficulties between Nick Rios and Jose Orosco in this case and likewise any other matters pertaining to their prior relations which have been introduced in evidence for the purpose of determining their state of mind at the time the fatal shot was fired."

The court gave no instruction upon the subject covered by this language, and we think, therefore, that the refusal to give the requested instruction was error. Such an instruction was called for by the testimony, and it was made particularly necessary because of the trial judge's reference to the poolroom episode as "remote," and by the manner in which he commented upon the evidence concerning appellant's damaged coat when the witness Serra was on the stand.

[12] Appellant introduced testimony at the trial to the effect that his reputation for peace and quiet was good. In view of this evidence he asked the court to give two certain instructions, but both were refused. One of them read: "The court charges the jury that evidence of the good character of the defendant comes in aid of the general presumption of innocence and is no more to be laid aside by the jury in their deliberations than is the general presumption itself. It is a fact in the case and itself may, in connection with all the other evidence in the case generate a reasonable doubt, sufficient to entitle the defendant to an acquittal." The other proposed instruction, although differently couched, was in legal effect the same as the one here set forth. The court erred in not giving one or the other of the two (*People* v. *Wilson,* 23 Cal. App. 513 [138 Pac. 971]).

[13] One of the instructions read to the jury contained the following: "The law of self-defense is founded on necessity, and in order to justify the taking of life upon this ground it must not only appear to the slayer, as a reasonable man, that he had reason to believe, and did believe, that he was in danger of his life, or of receiving great bodily harm, but it must also appear to his comprehension, as a reasonable man, that to avoid such danger it was absolutely necessary for him to take the life of the deceased." The question whether this instruction, in its use of the term "absolutely necessary," is a proper statement of the law has had a stormy career in the courts of this state, but its correctness was established in *People* v. *Bruggy,* 93 Cal. 476 [29 Pac. 26], and since that decision it has been upheld, either in the form in which it was given to the jury here or in similar forms, in *People* v. *Lemperle,* 94 Cal. 45 [29 Pac. 709], in *People* v. *Emerson,* 130 Cal. 562 [62 Pac. 1069], where the expression "necessary" was used without the quali-

fying word "absolutely," and perhaps in other cases. It was practically conceded to be correct in *People* v. *Cyty,* 11 Cal. App. 702 [106 Pac. 257]. These cases deal with what may be termed the rule of apparent necessity, that is, they decide that where it appears to an assailed person as a reasonable man that, because of the conduct of his assailant, it is necessary or absolutely necessary, to take the life of the assailant in order to save his own life, or to protect himself from great bodily injury, he may slay with impunity. The instruction here given was therefore correct. In addition to the cases last cited there are also decisions which deal with what may be called the rule of real necessity under the law of self-defense. These latter decide that where the jury finds that the assailed person was, through the conduct of the assailant, put in jeopardy of life or in danger of great bodily harm, the absolute necessity for slaying the assailant arises as matter of law. The cases on this subject are *People* v. *Hecker, supra; People* v. *Newcomer, supra,* and *People* v. *Estrada,* 60 Cal. App. 477 [213 Pac. 67]. It is not contended that appellant asked any instruction under the law as declared in these decisions.

[14] It is urged upon us that the trial court erred in instructing the jury "that self-defense is not available as a plea to a defendant who has sought a quarrel with the design to force a deadly issue and thus, through his fraud, contrivance or fault to create a real or apparent necessity for killing." The point is well taken. While the instruction was a correct statement of an abstract proposition of law, it was improperly given in the present instance for the reason that there was not in the record the slightest evidence that appellant sought a quarrel with Rios during the series of events leading up to the latter's death. See *People* v. *Maughs,* 149 Cal. 253 [86 Pac. 187]; *People* v. *Roe,* 189 Cal. 548 [209 Pac. 560].

In considering the damaging remarks and comments made by the judge during the trial of the action we have several times observed that no objection was interposed to them at the time they were uttered and that no request was made that the jury be admonished to disregard them. Appellant did, however, ask the court to read to the jury the following as a part of his final instructions: "During the course of this trial, counsel for the defendant asked a question by way

of impeachment of one of the witnesses in this case to which I answered as follows: 'The question shows the iniquity of that method. Because it does not appear here you will show it.' You are not to infer from this statement of mine nor from my attitude during the period of time which I made this statement that I intend to reflect any discredit upon the counsel for the defendant or upon the defendant himself; nor are you to infer from this statement that I have any opinion regarding any of the facts in this case, for with them I have nothing to do. You are the sole and exclusive judges of the facts." The following instruction was also proposed by appellant: "You are further instructed that during the course of this trial I have engaged at different times in discussions with the attorneys in the case and have made certain remarks during that time. In referring to certain evidence which the defendants were attempting to introduce, I have spoken of a certain practice as being 'iniquitous.' You are not to infer from my statements or from my attitude or actions in this case that I have any opinion in regard to the facts in this·case. You are the sole and exclusive judges of the facts in this case and with them I have nothing to do nor are you to infer from anything which I have said that I have any opinion regarding them and if my remarks have seemed to reflect even in the slightest degree upon the integrity of the counsel for the defendant, you are not to so regard them nor are you to indulge in any inference against the defendant because of my remarks made during the course of this trial." Each of these requested instructions was refused.

[15] Where a judge makes damaging comment in the presence of the jury during a trial, or where a district attorney takes a course which has a like effect, it is the duty of the counsel for the injured party to give the judge an opportunity to obviate the possibility of harm by means of admonition addressed to the jury, if the misconduct of either judge or district attorney is such that its effect may be removed by admonition (*People* v. *Hayes,* 72 Cal. App. 292 [237 Pac. 390]). In many of the cases which announce this rule it is said that the request for an admonition must be "timely." We do not understand this expression to mean that a request for the insertion of such an admonition

in the final instructions to be given to the jury is so untimely as to justify a judge in refusing to grant it. Such a request is surely timely to the extent that it will be effective, and a judge should be eager to give the instruction if a beneficial result may be expected or even hoped to flow from it. **[16]** We think the refusal to give either the one or the other of the requested instructions set forth above, under all the circumstances of the present case, was error. Some good could certainly have been accomplished by reading one of them to the jury, and the judge, having wrought the harm which followed from his injudicious remarks, should have made haste to embrace the opportunity to eradicate it. The judge did give a certain instruction which is read to juries in practically all cases, but we think it did not cover prominent features of the instructions which were refused. The given instruction read: "I have not expressed, nor intend to express, nor have I intimated or intend to intimate any opinion as to what witnesses are, or are not worthy of credence; what facts are, or are not, established; or what inferences are to be drawn from the evidence adduced: If any expression of mine has seemed to indicate an opinion relating to any of these matters such expressions must be disregarded by you." The refused instructions did not specifically cover all the harmful comment of the judge made during the trial, it is true, but some of the general language of them was calculated better to cover all of his injurious remarks than was the more general instruction which was given.

**[17]** We have made a careful examination of the entire cause, including the evidence, for the purpose of determining whether, under section 4½ of article VI of the constitution, a reversal of the judgment must follow from the error shown in the record. The evidence offered by appellant went solely to the point as to whether he had shot Rios in self-defense. In support of the issue thus presented by him there was much evidence of a positive character, while the testimony to the contrary was wholly negative and was much attenuated. This state of the record is so plain that we find it unnecessary to recite the evidence upon the subject. We do not hesitate to say that if we could be called upon to decide the cause from the showing made by the record, not

having an opportunity to observe the witnesses and thus to determine their credibility from their demeanor, we should hold that a slaying in self-defense was shown by a vast preponderance of the evidence and that appellant should have been acquitted. It may be, of course, that the witnesses offered by appellant were entirely unworthy of belief and that the jury may have been able to so determine from their appearance and manner of testifying. By our attitude upon the subject we do not intend to say that the question was not solely for the jury at the trial. It was. We express ourselves so forcibly only for the purpose of indicating that the showing of the cold record, upon which alone we may make application of the rule of the constitution, imperatively demands a reversal of the cause. This result must follow even if we view appellant's request for a final admonitory instruction as not being broad enough to cover all the erroneous remarks made by the judge during the trial. His characterization of the efforts of appellant's counsel when the latter was seeking to impeach some of the witnesses of the prosecution, his refusal of proper instructions requested by appellant, and his giving of an instruction asked by the prosecution which was improper, demand a reversal. As the evidence shown by the record inclines so strongly toward a support of the defense made by appellant, we are bound to assume that even a slight added circumstance favorable to him, or the removal of a slight circumstance unfavorable to him, would have impelled the jury to return a verdict of acquittal. Surely, if the trial court had not committed the errors mentioned, such a result would have been not only possible, but probable. This fact is indicated by a circumstance which we have reserved for final mention. Appellant was charged with murder. Under the evidence he either shot Rios in cold blood, or he was totally innocent of crime for the reason that the killing resulted through the exercise of the right of self-defense. There was in strictness no middle ground. The jury, however, found appellant guilty of murder in the second degree. Not only so, but after expressing that finding the verdict ends, "and ask the extreme lenience of the court." Here was a remarkable verdict. It showed nothing if it did not indicate that the minds of the members of the jury were in

a state of doubt as to the correctness of their solution of the problem submitted to them.

Judgment reversed and cause remanded for a new trial.

Finlayson, P, J., and Craig, J., concurred.