[Crim. No. 3990.   Second Dist., Div. One.   Oct. 30, 1946.]

THE PEOPLE, Respondent, v. JULIA CHAPMAN, Appellant.

652

Walter L. Gordon, Jr., for Appellant.

Robert W. Kenny, Attorney General, and Henry A. Dietz, Deputy Attorney General, for Respondent.

YORK, P. J.—Defendant was charged in an information filed by the District Attorney of Los Angeles County with the crime of murder. She entered a plea of not guilty and the jury found her "guilty of manslaughter, a felony, a lesser offense necessarily included in the charge set forth in the information." This appeal is prosecuted from the judgment of conviction and "from the order denying the motion for a new trial." Since no motion for a new trial was made, the appeal from the order denying a new trial must be dismissed.

Appellant here urges (1) that the evidence is insufficient to support the judgment of conviction; and (2) that the trial court committed prejudicial error in the giving and the refusal of instructions.

In connection with her first point, appellant points out that having admitted the shooting, "the question of guilt depended upon the claim of justification or self-defense. There was nothing inherently improbable in defendant's account of the shooting and it cannot be said from a reading of the record that the jury could not have reconciled all of the established circumstances with the theory of defendant's innocence."

From the record herein it appears that appellant and David Austin Tipton, the decedent, met and lived together illicitly in Texas; that in 1937 appellant moved to California, ostensibly to get away from deceased, but he followed her in a couple of months and they continued to live together. On the afternoon of July 27, 1945, deceased, who had been drinking, quarreled with appellant at her home because she would not give him some liquor, and he started fighting her and cursing her. Appellant operated a hot dog stand at night at 41st and Central Avenue, and on the evening of July 27, between 10 and 10:30, a Mr. McClain and a Mr. Garcia stopped at the stand for something to eat and drink, at which time they saw appellant and deceased at the stand, the latter apparently intoxicated; that appellant was inside the stand, deceased standing on the outside saying "Serve the whiskey over the bar"; and at the same time cursing and gesturing at appellant, who told him to leave and stop running her customers away. Deceased tried to enter the stand but without success. No weapons were observed in the hand of either appellant or deceased at this time, and because of the quarreling, Messrs. McClain and Garcia left.

At approximately 11 that same evening, Special Police Officer Burvender was walking near appellant's stand when he heard a sound like the discharge of a firearm, saw a crowd of people gathering near the hot dog stand and proceeded in that direction when he heard a second shot, saw the flash of a gun near the stand, went around in back thereof with another officer and found the deceased in a half reclining position on the ground. About 10:50 p. m. on the night in question, one Gaski, a Los Angeles police officer, was cruising in a police car near the intersection of 41st and Central when he heard a report that sounded like the discharge of a firearm. He glanced

toward the hot dog stand and saw appellant and deceased. He testified that he saw appellant leaning out of the service window of the hot dog stand with her arm protruding and a gun in her hand; and ''I saw a man later identified as the deceased Tipton, running away from the lunch stand. . . . I saw fire emerging from the pistol held by the defendant and the report of a gunshot about the same time that the deceased, Tipton, spun around and changed his direction and ran west to the service station lot where this lunch room is situated, to the rear of the service station.'' That the second shot was fired at deceased when he was less than 20 feet from the appellant; that the witness Gaski ''immediately made a U turn and drove in the service station grounds, got out of the police car and went to the lunch stand and the door was open and I put my hand out and Mrs. Chapman handed me a pistol''; a Colt .32 automatic pistol, with five shells in the clip and one in the barrel. Said officer asked appellant ''what had happened and who was she shooting at. . . . The defendant told me that it was her common law husband, that she had been having trouble with him for the past two years, he had been abusing her and had threatened to kill her and on this particular night he was bothering and molesting her again and she wasn't feeling well, so she shot him.'' Said witness then went to the rear of the service station to see deceased, who was kneeling and leaning against the building, with a wound in the left side of his neck.

The autopsy surgeon testified that death was due to internal hemorrhage due to gunshot wound of the neck and that the bullet which struck deceased was recovered in his body at the autopsy.

Mr. Dimon, a police officer of the city of Los Angeles, who took Mr. Tipton and appellant to the Georgia Street Receiving Hospital, and talked to both of them at that time, testified that before he died, Mr. Tipton, in answer to the officer's questions, stated that appellant shot him; that he had no weapon in his possession at the time of the shooting and had not put appellant's life in danger. When the officer suggested that Mr. Tipton be searched for weapons, appellant stated: ''Oh, there is no use, he didn't have anything anyway.'' Search of decedent revealed that he had a pair of pliers in his hip pocket at which time appellant volunteered the information to the officers that deceased had the pliers to fix the wiring of the hot dog stand. Thereafter, on the way to the police

station, this witness had a conversation with appellant to the following effect: ''I asked her where she had obtained the gun and she said that it was left at her place by some sailor who stayed there, who wasn't able to pay her and I asked her how long she had had it, and I don't recall now just how long she did say but—— then I asked her if she had been in the habit of carrying it from the house down there to the place of business and she said, 'No', she said that she kept it locked up in her closet at home with some liquor and other stuff that she had and that was the first time that she had ever brought it to the place of business, that she had anticipated trouble with Tipton that night because he had stayed home from work and was drinking and when he started drinking that he got mean and she also stated that some time prior to this incident that he had threatened her life with a butcher knife.''

In a typewritten statement in the form of questions and answers made to Sergeant R. H. Howsley of the Los Angeles Police Department, appellant stated that about 2 p. m. of July 27, 1945, she and deceased had an argument at her home at which time decedent ''tussled and hit me beside the head with his fists. . . . I asked him why he didn't go and leave me alone. He said if I gave him the stand and $100.00 he would go. . . . He said he didn't want to stay there.'' That around 7 she and deceased went to the hot dog stand together in another man's car; that she opened the stand and deceased left for a haircut returning about 9 p. m. when he started arguing with her and calling her names; that he pulled a pair of pliers out of his pocket and cut off the lights to the stand; that he made grabs at her and cursed her and then went across the street; that a boy named Arthur Davis, came to the stand and fixed the lights, whereupon deceased returned and cut them off again; that she then told Davis to go across the street and telephone ''for this man to come and pick me up, that we wasn't going to stay open any more. That's when he (deceased) started arguing again and cursing. That's the time he grabbed me and I jumped back. Then he goes around to the back door and told me to open it. He comes back to the front and said, 'I'm going to fix you up', get even with me. He goes back to the storeroom. I peeked out the door and saw him unlock the door and that's when I reached up and got my purse and put the gun on the little shelf. When he walked up, cursing me, that's when I shot him. . . . I went out and closed the door. . . . When I shot him, he ran around the

station. . . . I don't think I had fired but once, but they said twice.'' In answer to the question: ''When you took this gun from the closet on the afternoon of July 27, 1945, and put it in your purse, did you think at that time that you were going to have trouble with Tipton?'', appellant stated: ''I thought I would. When he lays off, I always have trouble with him''; that this was the first time she had carried the gun to the hot dog stand. ''Q. Did Tipton strike you with any object of any kind there at the hot dog stand? A. No. He had the pliers in his hand, but was going, I think. He still had them in his hand. Q. He didn't strike you? A. He just grabbed at me. Q. After you had taken the gun from the purse and laid it on the shelf, when did you pick the gun up in your hand? A. I had my hand on the gun when I saw him. I was sitting on a stool and I saw him coming from the direction of the store-room. I had my hand on it, was a rag covering it. Q. When he approached, you picked the gun and put it in your hand? A. I had an idea and as he passed the window—— it was on the side—— I had the gun in my hand. Q. What did he do when he came up? A. He said, 'You dirty bitch if you think you are going to get rid of me.' Q. What did he do? A. That's all he said and I let him have it. He came right up close. Q. But you didn't see him make a grab at you? A. No. I said, 'I have told you to let me alone.' . . . I stood up. He was right up against the counter and I raised up and fired.''

Appellant took the stand in her own defense and testified, among other things, that she was afraid of decedent; that in January of 1945 he hit her over the left eye with an unopened knife, the wound requiring two or three stitches to close; that in March of that year he was fighting her and she started to run to her aunt's home; that he caught her before she reached that place, hit her and knocked her down, a ring on his finger cutting her on the head between the eyes; that in April he came home drunk when appellant was entertaining friends, started arguing, followed her into the bedroom, threw her on the bed and hit her ''about seven or eight times and my eyes were all black, it knocked my tooth through my lip''; following this, appellant's friend Mrs. Griffith stayed with her about a week because she had to stay in bed; that a week or so prior to the shooting, decedent was drunk and was running around the house with a butcher knife and that she got away and ran to her neighbor Burnett's home.

Appellant testified that on the night of the shooting, de-

ceased threatened to kill her; that he struck at her, "Oh, I guess five or six times. . . . He had the pliers in his hand." That he was striking hard but missed her because she would jump back; that "as he went around to the storeroom he said he was going to kill me, and I got the gun then." Appellant stated that during the time decedent was striking at her with the pliers she shot him; she thought she shot him once but didn't remember shooting him twice; that he was not running away from the stand when she shot him, but was striking at her. She also testified on cross-examination, that during the period of decedent's abusive treatment of her, she never complained to the police department or other public official, although on one occasion when he was chasing her with a butcher knife she started for the Newton Street Station, but returned home with decedent on his promise not to fight with her; that on the night of the shooting, she decided to go home after he threatened to kill her but did not ask Arthur Davis to call the police; that she did not consider it serious enough to take it up with the authorities.

It is obvious from the foregoing résumé that the evidence was amply sufficient to support the jury's verdict of manslaughter and the resulting judgment. Appellant had plenty of opportunity on the day of the shooting to make a complaint against decedent, but instead she took the gun from her house to the hot dog stand in anticipation of trouble, and when decedent verbally abused her and physically threatened her armed, if at all, with a pair of pliers, she took the law into her own hands. The circumstances under which the shooting occurred, i. e., the comparatively safe position of appellant in that the only weapon at decedent's disposal was the pair of pliers, the fact that appellant gave him no warning of her purpose but fired twice, once while he was running away from her,—all negative the claim of self-defense or justification.

As stated in *People* v. *Holt*, 25 Cal.2d 59, 65 [153 P.2d 21] : "The basic law of self-defense is set forth in sections 197 and 198 of our Penal Code. So far as pertinent here section 197 provides that 'Homicide is . . . justifiable when committed by any person in either of the following cases: . . .

" '3. When committed in the lawful defense of such person . . ., when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished; but such person . . . if he was the assailant or engaged in mutual com-

bat, must really and in good faith have endeavored to decline any further struggle before the homicide was committed. . . .'

"Section 198 reads as follows: 'A bare fear of the commission of any of the offenses mentioned in subdivisions two and three of the preceding section, to prevent which homicide may be lawfully committed, is not sufficient to justify it. But the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone.'

"The pertinent principles governing the right of self-defense are explained in *People* v. *Westlake* (1882), 62 Cal. 303, 307: 'The apprehension of danger to life or limb which justifies a man for taking the life of another must be an honest one—one that is well-grounded, and must arise out of a reasonable cause; . . .' "

In *People* v. *Jackson,* 74 Cal.App.2d 22, 24 [167 P.2d 776], the appellant contended, after admitting the killing, that it was done in self-defense, and that the evidence was insufficient to sustain the verdict, as it is here contended, the court said:

"We find no merit in defendant's first contention. Her sole defense to the admitted killing was that of self-defense. The argument which her counsel has addressed to us upon this issue concerns the threats made upon the life of defendant by her husband, his general demeanor on the day of the shooting and his actions immediately prior thereto, matters which were all presented to the jury. It is not the province of this court to weigh the evidence. That is the function of the jury in the first instance and of the trial court after the jury has concluded its deliberations and a verdict has been reached. Where, as in the present case, the jury has found against the defendant and the trial court has denied a motion for a new trial, such conclusions will not be set aside on appeal on the ground of insufficiency of the evidence where it is not made to clearly appear 'that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below.' (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].) "

■ Appellant claims the court erred in refusing to give the following instruction requested by her, particularly that portion thereof pertaining to the right of pursuit:

"A person in the exercise of his right of self defense not only has a right to stand his ground and defend himself when attacked but he may pursue his adversary until he has secured himself from danger."

In making this contention, appellant cites *People* v. *Orsco*, 73 Cal.App. 580 [239 P. 82] ; *People* v. *Carson*, 43 Cal.App.2d 40 [110 P.2d 98] ; *People* v. *Kinowaki*, 39 Cal.App.2d 376 [103 P.2d 203], and *People* v. *Hatchett*, 56 Cal.App.2d 20 [132 P.2d 51], in support thereof. An examination of those cases, however, leads to the conclusion that while it may be error to refuse or to fail to give such an instruction where the facts of the particular case reveal a theory or a factual situation wherein the right to pursue and slay is actually involved, no such situation exists in the present instance. Appellant shot deceased when he was directly in front of her, without warning and at a time when decedent was unarmed except for a pair of pliers. Moreover, she shot the second time when he was running away from her, hence the right to pursue and slay is not involved. In *People* v. *Hatchett, supra,* where the defendant testified that the decedent, while in an intoxicated condition, pointed a gun at her and threatened to shoot her, that she knocked the gun from his hand and a tussle ensued, and that she shot the decedent as he was coming toward her with a metal smoking stand, the court held that she was entitled to have the jury fully instructed on the law of self-defense, particularly with regard to her right to stand her ground and defend herself when attacked and to pursue her adversary until she had secured herself from danger.

In *People* v. *Hecker,* 109 Cal. 451, 463 [42 P. 307, 30 L.R.A. 403], also cited by appellant, there was a shooting affray wherein both parties were shooting at each other with no apparent abandonment thereof on the part of either. There the court failed to give an instruction on the right of pursuit and on this and other grounds the conviction was reversed, it being there stated: ''So, too, under such circumstances, he may pursue and slay his adversary. But the pursuit must not be in revenge, nor after the necessity for defense has ceased, but must be prosecuted in good faith to the sole end of winning his safety and securing his life.''

There was no evidence produced herein which would require an instruction on the right of pursuit, and although the trial court would not have gone astray in giving such an instruction, it was not legally required to do so, and no prejudicial error resulted from its refusal to so instruct the jury.

■ Appellant also urges that prejudicial error was committed by the refusal of the trial court to give the following instruction on the doctrine of appearances:

"You are instructed that the defendant was entitled to act upon the doctrine of appearances, and if the language and conduct of Mr. Tipton was such as to induce in the mind of a reasonable man, under all the circumstances then existing and viewed from the standpoint of the defendant, a belief that he was about to be attacked by Mr. Tipton, it does not matter if such danger was real or apparent; and if the defendant acted in self defense from real and honest convictions as to the character of the danger induced by the existence of reasonable circumstances he should be acquitted even though he was mistaken as to the extent of the danger. If the evidence produced in your minds a reasonable doubt as to whether or not the words and actions of Mr. Tipton constituted such an appearance as would cause a reasonable man in the defendant's position to believe that he was in danger of attack immediately then you should resolve that doubt in favor of the defendant and find her not guilty."

It is also contended by appellant that the court committed prejudicial and reversible error in the giving of the following instruction on the doctrine of appearances:

"A person may have a lively apprehension that he is in imminent danger, and believe that his apprehension is based on sufficient cause and supported by reasonable grounds; that such apprehension is reasonable and warranted from appearances as they present themselves to him. If, however, he acts on these appearances, he does so at his peril, because the law leaves it to no man to be the exclusive judge of the reasonableness of the appearances upon which he acts, but prescribes a standard of its own, which is not only did the person acting on the appearances himself believe that he was in deadly peril of his life or of receiving great bodily harm, but would a reasonable man, situated as the defendant was, seeing what he saw, and knowing what he knew, be justified in believing himself in danger." Appellant urges that the court in *People* v. *Hatchett*, 63 Cal.App.2d 144, 158 [146 P.2d 469], in considering an instruction identical to that last hereinabove quoted, stated "It is true that the four instructions given at the request of the People do not incorrectly state the law of self-defense, but they stated the rule negatively and from the viewpoint solely of the prosecution. . . . The difference between a negative and a positive statement of a rule of law favorable to one or the other of the parties is a real one, as every practicing lawyer knows. . . . There should be absolute impartiality as between

the People and the defendant in the matter of instructions, including the phraseology employed in the statement of familiar principles.''

In addition to the instruction of which appellant complains the court gave the following instruction, which was requested by appellant: ''Under our law a person assailed has the right to repel force with force, and he may employ the right to defend himself from apprehended danger to any extent which to him is apparently necessary, acting in a reasonable manner. If you find from the evidence in this case that Mrs. Chapman's conduct in this case was such as to induce in the mind of a reasonable person the fear that she would be done great bodily harm or injury then I instruct you that the defendant had the right to defend herself from that apprehended danger to that extent which to her was apparently necessary, acting in a reasonable manner.'' This instruction is a correct statement of the rule of appearances and positively advised the jury on a question as to which it had been negatively instructed. It therefore became unnecessary for the court to give the refused instruction on the doctrine of appearances.

It is finally argued that the court committed prejudicial error in giving the following instruction:

''Manslaughter is the unlawful killing of a human being without malice. It is of two kinds: 1. Voluntary—upon a sudden quarrel or heat of passion. 2. Involuntary—in the commission of an unlawful act not amounting to a felony, or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection.'' *People* v. *Hatchett*, 63 Cal.App.2d 144, 159 [146 P.2d 469], is again cited in support of this point.

The instruction complained of is a direct quotation of section 192 of the Penal Code. Moreover, appellant fails to complete the instruction, i. e., a lengthy explanation of the definition of manslaughter. The same question arose in the case of *People* v. *Hashaway*, 67 Cal.App.2d 554, 569 [155 P.2d 101]. It was there stated: ''Defendant asserts that the portion of the instruction relating to involuntary manslaughter should not have been given for the reason that 'when a person commits a homicide in necessary self-defense, he is not bound to use any due caution and circumspection when protecting himself.' That reason, so assigned by defendant, is based upon the assumption that at the time the instructions were given it was known that defendant acted in self-defense. It was a

question of fact for the jury as to whether defendant acted in self-defense. At the time the instructions were given, the jury, of course, had not determined whether the defense of self-defense had been proved.'' Likewise, in the instant case, self-defense as a justification for the shooting was a question for the jury to determine, consequently the definition and explanation contained in the instruction objected to was not prejudicial to appellant's cause. It should not be overlooked that appellant here was charged with murder which included the lesser offense of manslaughter, and since as a matter of law both voluntary and involuntary manslaughter were involved therein, it could not be prejudicial error to give the instruction complained of.

For the reasons stated, the judgment appealed from is affirmed. The appeal from the order denying a new trial is dismissed.

Doran, J., and White, J., concurred.