[Crim. No. 4769. In Bank. Sept. 10, 1947.]

THE PEOPLE, Respondent, v. JOSE SANCHEZ SANCHEZ, Appellant.

D. M. Campbell and D. M. McGahey for Appellant.

Fred N. Howser, Attorney General, Henry A. Dietz and Frank Richards, Deputy Attorneys General, for Respondent.

SCHAUER, J.—On February 9, 1946, defendant Sanchez admittedly killed Alejandro Garcia, concealed his body, and fled from the United States. Thereafter defendant was ap-

prehended and prosecuted. A jury found him guilty of murder of the first degree and made no recommendation as to penalty. Defendant appeals from the ensuing judgment imposing the death sentence and from an order denying his motion for new trial.

It is the theory of the People that defendant murdered Garcia in the perpetration of robbery; it is the theory of defendant that he killed justifiably in self-defense or, at least, in such a frenzy of terror that the killing could be no more than murder of the second degree or voluntary manslaughter. No other explanation of, or reason for, the slaying is claimed. It is true that the charge to the jury contains many erroneous and irrelevant instructions which in other circumstances could require a reversal. However, the evidence (hereinafter related) amply justifies a finding that Garcia was murdered by defendant in the perpetration of a robbery; the jury were adequately instructed as to this phase of the case; and it does not appear that they were misled by other instructions or that errors complained of by defendant resulted in a miscarriage of justice. Therefore, the judgment must be affirmed.

Defendant and Garcia were Mexican laborers who had worked on farms in the Imperial Valley. On the evening of Friday, February 8, 1946, they told the farmer by whom they had been employed that ''They wanted to lay off . . . to go to Mexicali.'' Each received his pay check, defendant's being for the sum of $52.70 and Garcia's for $77.80. The two men went to the cabin where they resided. This cabin contained two rooms, a kitchen and a bedroom; its single outside door opened from the kitchen. At about 4 or 5 o'clock on Saturday morning defendant killed Garcia with an axe, dragged his body to an outside toilet and concealed it beneath the toilet seat, washed some of the blood from the cabin, and fled to Mexico. Before he was killed, Garcia had, besides his pay check, ''a good watch,'' a pair of shoes and (according to defendant) a knife. When his body was discovered, about 8 or 9 o'clock on Saturday morning, none of these articles of personal property were on the body or in the cabin or its vicinity. Garcia's pockets contained only 25 cents. His body bore five deep axe cuts which apparently had been inflicted in rapid succession: one across the small of the back, which went through his belt, through another belt which held a truss, and to the bone; one into the head, from which brain

tissue had spilled; one across the mouth, breaking bones and teeth; one which nearly severed the left arm above the wrist; and one which went through the left thigh to the bone. On the throat were marks (not deep cuts) which appeared to have resulted from "stabbing" or "gouging" with a knife or scissors. A pair of sheep shears was found in the cabin.

Defendant cashed his pay check in a grocery store on Saturday morning before he left this country. Garcia's pay check, endorsed "Garria" or perhaps "Garsia," was also cashed at this store. In the opinion of a handwriting expert, the endorsement thereon was written by defendant. Exemplars of defendant's handwriting made by him after his arrest similarly misspelled the name of deceased as "Garria" or as "Garsia." Pay checks made and delivered to Garcia by a former employer and cashed prior to the dates involved herein were endorsed "Alejandro Garcia"; such latter endorsements, in the opinion of the handwriting expert, were not written by defendant. Defendant on cross-examination testified as follows:

"Q. Now, before you put—or at any time after you killed Alejandro Garcia, did you take anything from his clothes or from his body? A. No. I didn't take anything.

"Q. I am showing you a check which is People's Exhibit No. 1 [the pay check Garcia received the evening before he was killed], and ask you if you had that check in your possession that morning. A. No, sir. . . .

"Q. Did Garcia carry a watch? A. I don't know. I never saw it if he did."

The limited extent of these denials, and the fact that they were adduced only upon cross-examination, should be noted. Defendant did not deny that he endorsed or negotiated Garcia's pay check nor did he claim that he formed the intent to and did take any articles of personal property from Garcia only after the latter's death.

Defendant's testimony as to the circumstances of the homicide is as follows: Prior to the day of the killing Garcia "got sore because I had to correct him for poor work . . . [F]rom that time on he did things that were not right, and I paid no attention to him." On the morning of Saturday, February 9, Garcia, contrary to his custom, arose early and prepared coffee. Defendant wakened but did not arise. "I could see he had some bad intentions. And he turned out the light, and I had a cigarette lighted, and I put it out, and

then I pulled the bed clothes up over me. . . . I heard him open a knife.'' Defendant did not see the knife at this time or during the ensuing struggle but he knew that Garcia carried a pocket ''spring knife . . . One of those that the blade jumps.'' Deceased leaped upon defendant and struck at his head with the knife but did not cut him. Defendant ''slipped out from under him,'' ran out the door and attempted to fasten it ''to stop him coming out, and then as I was trying to fasten the door was when he jumped on me and tried to cut me in the throat, and that was when, in guarding, I received this cut on my arm.[1] . . . Then he was pursuing me, right behind me, and I was forced to do what I could to defend myself, and the first thing I got hold of was an axe [which was lying about 18 feet from the door of the cabin] . . . and then I struck him a blow, and at that time he—was when he tried to cut me in the stomach, and from the right I struck him another one. I don't remember any more about it than that. And then he turned half around . . . and he stumbled over there by the door of the house.[2] And then I stood there not knowing what to do, whether to give notice or advise the authorities, or whether to beat it. Then I thought I would put him in the hole, because I would be punished. And therefore then I hauled him over to where the hole was, in order to allow myself a chance to get away. Then I threw him in the hole and I went back into the house and I got the wash basin and took it over to . . . [the] stove, and washed my arm. Then when I got through with the arm I took the basin of water and began to clean up there. I took a sweater . . . and I grabbed my handkerchief and tied it around my arm and took to the road.''

The testimony of defendant (which was given through an interpreter) corresponds closely to defendant's answers to questions of the district attorney given through another interpreter shortly after defendant was apprehended.

The physical condition of the scene of the homicide on the morning Garcia was killed and after defendant had fled,

[1]A superficial cut which, according to testimony of a physician who examined defendant on July 11, 1946 (five months after the killing), could not have been more than six weeks old at the time of such examination.

[2]According to the testimony of the physician and surgeon who examined the body of Garcia, after a man received a wound such as one of those on Garcia's head or back ''He wouldn't go anywhere. He would simply drop.''

was as follows: In the bedroom was a bed and also a pallet on the floor. The covers on the pallet were stained with "a considerable amount of blood" and "appeared to have been cut with some sharp object." (Although defendant was not asked directly whether he was in the bed or on the pallet when Garcia assertedly attacked him, it appears that he was in the bed. He testified that "All of the time we [defendant and Garcia] were there we slept in that same bed, because it was the only bed that was there, and it was a big bed"; that shortly before the homicide defendant arose and then "went back to bed.") In the kitchen there was blood on and under the stove. The blood spots on the stove did not "appear to be the result of an open cut that was dripping"; "they were not on top, they came down at the side and down at the bottom, as though they had been splattered up against the stove." The kitchen floor had been recently washed but a large spot of blood remained. The step leading from the cabin had been washed and swept but blood spots remained on it. It is significant that although there was blood in the cabin and on the cabin step, and "an enormous amount of blood on the door and on the floor of the toilet, and on the seat of the toilet," there was no blood at the location outside where, according to defendant, Garcia was killed; that the kitchen and the step had been scrubbed and swept whereas the ground where, according to defendant, Garcia was killed was not disturbed except for a mark "as though something had been dragged along" displacing the leaves and surface of the soil. This "drag mark" ran from the cabin step to the toilet and in it were prints of high-heeled boots such as defendant customarily wore.

The instructions given as to self-defense are long and repetitious.* Defendant contends that they "seriously limit defendant's right to defend his life and person." Some of the

---

*Among these instructions are the following:

"In the present case, it is not denied by the defendant that he killed Alejandro Garcia, the deceased, but he claims that it was in necessary self-defense, and to *repel* a violent and dangerous attack which the deceased was then making, or was about to make upon him. The right of self-defense of a party violently assaulted by another, *to repel such attack and fully protect himself,* is a law of nature. It antedates all written enactments, and is fully recognized in the laws and regulations of all civilized people. The right is expressly recognized by our own statutes, and the conditions under which it may be asserted are clearly defined. These are, that the party was not himself the first aggressor; or if the aggressor, that he had in good faith withdrawn from the contest before

instructions singled out for attack are not undue limitations, but rather approved definitions, of the extent of the right of self-defense. Others, while not model statements, are not misleading when read in their context. Although there was no occasion to state more than once certain principles as to the law of self-defense those principles are not prejudicially misstated.

 Defendant complains that the charge as to self-defense does not include a correct instruction requested by him, or any instruction, embodying the principle that "A person in the exercise of his right of self-defense not only has a right to stand his ground and defend himself when attacked *but he may pursue his adversary* until he has secured himself from danger." (Italics added.) Such an instruction, it has been held, "clearly states the law on the subject." (*People* v. *Hatchett* (1942), 56 Cal.App.2d 20, 22 [132 P.2d 51].) It has been held that the substance of the requested instruction relative to the right to pursue an adversary as well as stand one's ground is not adequately covered by instructions (given in the instant case) that in exercise of the right of self-defense one may repel force by force and may act upon apparent necessity (*People* v. *Orosco* (1925), 73 Cal.App. 580, 598

the fatal blow. Second, that the slaying was necessary to prevent the infliction upon himself of a great bodily injury by the party slain.

"To justify the killing of another in self-defense, it must appear that the danger was so urgent and pressing, that, in order to save his own life, or to prevent his receiving great bodily harm, the killing of the other was necessary, and it must appear that the person killed was the assailant, or that the slayer had really and in good faith endeavored to decline further struggle before the mortal blow was given.

"A bare fear of the commission of the offense, to prevent which a homicide may lawfully be committed, is not sufficient to justify it; but the circumstances must be sufficient to excite the fears of a reasonable man, and the party killing must have acted under the influence of such fears alone. It is not necessary, however, to justify such killing, that the danger be actual. It is enough that it be an apparent danger; such an appearance as would induce a reasonable person in defendant's position to believe that he was in immediate danger of great bodily injury. Upon such appearances, a party may act with safety; nor will he be held accountable, though it should afterwards appear that the indications upon which he acted were wholly fallacious, and that he was in no actual peril.

"The rule in such cases is this: What would a reasonable person—a person of ordinary caution, judgment and observation—in the position of the defendant, seeing what he saw, and knowing what he knew, suppose from this situation and these surroundings? If such reasonable person so placed would have been justified in believing himself in imminent danger, then the defendant would be justified in believing himself in such peril, and acting upon such appearances. The defendant is not necessarily justified, because he actually believed that he was in imminent

[239 P. 82]). But here, if defendant's testimony is accepted at its face value, the failure to give the requested instruction, if error at all, is not prejudicial, for the defendant did not claim that he pursued the decedent or even that he stood his ground; on the contrary, defendant testified that he fled and that decedent pursued him and that, during his effort to escape, he killed Garcia while acting under the influence of terror induced by Garcia's unprovoked attack. If defendant's testimony had caused the jury to have a reasonable doubt as to defendant's state of mind or purpose at the time of the killing, then, under the instructions which were given, they certainly could not have found him guilty of murder of the first degree as defined in the instructions, but must either have acquitted him or found him guilty only of a less serious type of homicide. It is not, on this record, a reasonable inference that the giving of the requested instruction on the right to pursue as well as to stand one's ground would have affected the jury's conclusion. Hence, even if we interpret the circumstances shown (having in mind, particularly, the five severe axe wounds) as indicating that the defendant, contrary to his own testimony, had, when attacked or at any time during the fight, instead of fleeing, stood his ground and then

danger. When the danger is only apparent, and not actual and real, the question is, 'Would a reasonable man, under all the circumstances, be justified in such belief?' If so, the defendant will be so justified. If this was defendant's position, it was his right to *repel the aggression*, and fully protect himself from such apparent danger. . . .

"If you believe that the deceased himself made the first hostile demonstration against the defendant by drawing or attempting to draw a weapon, or otherwise assaulting him in such a manner and under such circumstances as would have justified a reasonable man in defendant's situation in believing that the deceased was about to inflict upon defendant great bodily injury, the defendant was justified in acting upon these appearances and belief; and if necessary, for his own protection, and to prevent great bodily injury to himself, he killed the deceased, he was justified in so doing, and your verdict should be one of acquittal. . . .

"A person *may repel force by force* in defense of person, property, or life against one who manifestly intends or endeavors by violence or surprise to commit a known misdemeanor or felony or either or to do great bodily injury to his person and the danger which would justify the defendant in the act charged against him may be either real or apparent; and the jury are not to consider whether the defendant was in actual peril of his life or property, but only whether the indications were such as to induce a reasonable man to believe that he was in such peril of person or property; and if he so believed reasonably, and had sufficient cause so to believe and committed the act complained of under such belief, you should acquit the defendant. . . ." (Italics added.)

The court also instructed the jury in the words of sections 197 and 198 of the Penal Code.

pursued Garcia, the error in failing to give the requested pursuit instruction could not here be held to require reversal.

Defendant complains of the refusal of the court to give the following instruction which he requested and which, he argues, was necessary to enlighten the jury in case they determined that defendant first killed justifiably and then decided to and did take the property of his victim: ''If you believe from the evidence defendant killed in defense of his life, then notwithstanding the fact that you also find that defendant subsequently committed another offense you must acquit him.'' Defendant is correct in his assertion that a killing which was justifiable cannot become criminal by virtue of subsequent conduct of the killer. But there is nothing in the instructions which could give a contrary impression and the defendant did not testify, nor is there other evidence to suggest, that he formed the intent to or did take any of Garcia's property only after the latter's death. He claimed only that he killed in actual self-defense or possibly in terror induced by Garcia's asserted attack. No motivating cause for the killing other than defendant's theories or the State's theory of robbery can logically be gleaned from the evidence. The jury were told that ''All murder . . . which is committed in the perpetration or attempt to perpetrate . . . robbery . . . is murder of the first degree'' (Pen. Code, § 189) and that ''Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear'' (Pen. Code, § 211). It is clear from these instructions that to constitute the killing murder of the first degree because it was committed in the perpetration of robbery, the killer must, at the time of the killing, have had the purpose to rob (although not necessarily the purpose to kill), whereas, as the jury were told, in the case of a justifiable killing in self-defense defendant ''must have acted under the influence of such fears [of great bodily harm] alone'' (Pen. Code, § 198). In view of all the evidence and of the instructions which were given and which have been previously noticed, it is not reasonably conceivable that the jury could have believed, or had a reasonable doubt, that the defendant killed Garcia in self-defense or terror, and still have found the verdict of first degree murder. If they had had a reasonable doubt on the question of self-defense or killing in terror they must have either acquitted the defendant or found the homicide to be an offense less than first degree

murder. Hence, the refusal of the instruction as worded (predicated on belief that "defendant killed in defense of his life") did not prejudice defendant.

■ Here, as in *People* v. *Peterson* (1946), 29 Cal.2d 69, 78-79 [173 P.2d 11], "The court, in instructing the jury as to what constitutes murder of the first degree (apparently inadvertently, in the light of its other instructions), erroneously included portions of disapproved former stock instructions declaring that 'There are certain kinds of murder which carry with them conclusive evidence of premeditation . . . [etc.],' and that a man 'can premeditate, that is, think before doing the act, the moment he conceives the purpose.' Each of these two former stock instructions has been often condemned. (*People* v. *Bender* (1945), 27 Cal.2d 164, 182-185 [163 P.2d 8]; *People* v. *Valentine* (1946), . . . 28 Cal.2d 121, 134, 135 [169 P.2d 1]; *People* v. *Bernard* (1946), . . . 28 Cal.2d 207, 210-212 [169 P.2d 636]; *People* v. *Honeycutt* (1946), 29 Cal.2d 52 [172 P.2d 698].) In the present case they directly conflict with other, correct instructions which the court gave on the same subjects. 'Inconsistent instructions have frequently been held to constitute reversible error where it was impossible to tell which of the conflicting rules was followed by the jury. [Citations.]' (*People* v. *Dail* (1943), 22 Cal.2d 642, 653 [140 P.2d 828].)'' As shown above, there is evidence that defendant murdered in the perpetration of robbery. The instructions as to that phase of the case are not incorrect although unnecessarily repetitious, and it does not appear that the instructions as a whole so misled the jury that their conclusion that defendant is guilty of first degree murder is based on a finding not that the murder was committed in the perpetration of robbery, but that defendant "premeditated" before killing the moment he conceived the purpose to kill.

■ The jury were correctly instructed in the language of section 1096 of the Penal Code concerning presumption of innocence and the definition of reasonable doubt. ■ Other portions of the charge as to reasonable doubt include a lengthy instruction which commences as follows: "[I]f you believe from the evidence, beyond a reasonable doubt and to a moral certainty, that the defendant . . . did, unlawfully and with deliberate, willful, intentional premeditation and with felonious intent kill the deceased . . . and that said killing was done with malice aforethought and was not justifiable under

the law as I have given it to you in the preceding instructions, and you further believe from the evidence beyond a reasonable doubt and to a moral certainty that the defendant is guilty of murder of the first degree, *as defined in the preceding instructions heretofore given to you* [which include definition of murder in the perpetration of robbery], then, you would be warranted in so finding by your verdict. . . .'' (Italics added.) The instruction contains similar paragraphs as to murder of the second degree and manslaughter, reiterates that each element of an offense must be established beyond a reasonable doubt to justify a verdict of guilty of such offense, and concludes with the statement, ''All reasonable doubts must be resolved in favor of the defendant by your verdict of not guilty.'' The first portion of this instruction, although it is unnecessarily complex in its wording, contains no actual misstatement of law. The last quoted sentence of the instruction, as defendant says, is at best ambiguous and should not have been given, but we cannot agree with defendant that, upon the whole record, there is any probability that the jury seized upon it and concluded, despite other, correct instructions to the contrary, that in order to acquit defendant they must decide in his favor every issue upon which they had a ''reasonable doubt'' or that no reasonable doubt, on any issue (as for example, the issue of punishment or that of degree of the offense) could be resolved in his favor except by a complete acquittal.

■ Defendant contends that the court erred in failing to give an instruction, requested by him, that ''In a trial for murder it is not necessary for the defendant to establish self defense by evidence sufficient to satisfy the jury that the self defense was true, but if the evidence is sufficient to raise a reasonable doubt as to whether the defendant was justified, then he is entitled to an acquittal.'' This proposed instruction correctly states the law and, where the evidence warrants submitting the issue to the jury, should be given. (See *People* v. *Kane* (1946), 27 Cal.2d 693, 701 [166 P.2d 285] ; see, also, *People* v. *Roe* (1922), 189 Cal. 548, 565 [209 P. 560] ; *People* v. *Albertson* (1944), 23 Cal.2d 550 [145 P.2d 7], at p. 587 of concurring opinion ; 13 Cal.Jur. 737, § 104.) However, its principle was repeatedly brought to the attention of the jury for, as above indicated, they were told as to murder of the first degree, again as to murder of the second degree, and again as to manslaughter, that to warrant a verdict of

guilty they must believe "beyond a reasonable doubt and to a moral certainty" that, among other things, the killing "was not justifiable [or was unjustifiable] under the law as I have given it to you in the preceding instructions." They were also told that they "should consider all of the instructions as a whole in arriving at" their verdict. Under the circumstances the error in failing to give the instruction as requested was not prejudicial.

 The jury were told in the language of section 192 of the Penal Code that involuntary manslaughter "is the unlawful killing of a human being, without malice . . . in the commission of an unlawful act, not amounting to felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." Defendant relies upon *People* v. *Hatchett* (1944), 63 Cal.App.2d 144, 161 [146 P.2d 469], where it is said that by this instruction the jury were told that "the act of shooting, if believed lawful [in self-defense], might constitute the offense of manslaughter if it was done in an unlawful manner or without due caution and circumspection. Any such theory of guilt would have been entirely unsupported by the evidence or any legitimate inferences to be drawn therefrom. The instruction clearly tended to divert the minds of the jury from the sole question whether defendant acted reasonably and in good faith in defending herself from a felonious attack and may well have operated to her prejudice." The People rely upon *People* v. *Hashaway* (1945), 67 Cal.App.2d 554, 569 [155 P.2d 101], and *People* v. *Chapman* (1946), 76 Cal.App. 2d 651, 662 [173 P.2d 860]. In those cases it is said that because the defendant was charged with murder, and involuntary manslaughter "as a matter of law" was "involved" in such charge, it was proper to instruct concerning involuntary manslaughter. These statements are not correct and are disapproved. The charge to the jury in a homicide case should comprise instructions on the law applicable to issues raised by the evidence, not a dissertation on all the classes of homicide known to the law. It is error to give an instruction which correctly states a principle of law which has no application to the facts of the case. (*People* v. *Roe* (1922), *supra,* 189 Cal. 548, 565; *People* v. *Silver* (1940), 16 Cal.2d 714, 722 [108 P.2d 4].) We agree with defendant that a trial judge should be diligent in refraining from burdening the jury and the record with inapplicable instructions and in avoiding unnec-

essarily prolix and repetitious statements as well as in informing the jury adequately on the law pertinent to their duties on the issues actually involved. In the present case, however, it does not appear that the giving of the subject instruction had any effect other than to add to the bulk of the charge. Since the jury rejected defendant's testimony that he killed under the influence of fear and found that the homicide was murder of the first degree, they could not have been concerned, as they might have been in the Hatchett case (where the defendant was charged with and convicted of manslaughter only [p. 147 of 63 Cal.App.2d]), with the possibility that a killing in self-defense might be involuntary manslaughter because not done cautiously and circumspectly.

 Defendant next contends that the trial court erred to his prejudice when, on the last day of trial, it put Deputy Sheriff Bridwell in charge of the jury while they lunched and while they retired to consider their verdict. Bridwell was active in the investigation conducted after the body of deceased was found and was an important prosecution witness. Defendant concedes that there is no showing that Bridwell was actually prejudiced against defendant but urges that the officer ''was biased against the defendant as a matter of law'' and placing the jury in his charge gave ''an unwarranted weight to the state's evidence.'' No objection was made at the time Bridwell was sworn to take charge of the jury. The People concede, as indeed they must, that it was ''poor practice and poor judgment'' to have placed Bridwell in charge of the jury but urge that the mere fact of such ''poor practice,'' without timely objection thereto and without any showing of actual prejudice, is not ground for reversal. It must be recognized that the act complained of, under other circumstances, could well amount to worse than ''poor practice.'' Where it was proved that the sheriff because of bias was disqualified to summon a jury (Pen. Code, § 1064), it was held to be prejudicial error to entrust the jury to his care, over defendant's objection, when it retired to deliberate. (*People* v. *Fellows* (1898), 122 Cal. 233, 238 [54 P. 830].) On the other hand, it has been held that it was not ground for reversal that a jury was placed in charge of an officer who was technically disqualified or even actually biased, where no timely objection was made and there was no showing of actual prejudice to defendant. (*People* v. *Babcock* (1911), 160 Cal. 537, 546 [117 P. 549]; *People* v. *Nakis*

(1920), 184 Cal. 105, 113 [193 P. 92] ; *People* v. *Zirbes* (1936), 6 Cal.2d 425, 430 [57 P.2d 1319] ; *People* v. *Hamilton* (1920), 49 Cal.App. 30, 38 [192 P. 467].) To the credit of Deputy Sheriff Bridwell, it is noted that a careful scrutiny of the record leads to the conclusion that he is an intelligent and ethical peace officer, fair alike to the State and to the defendant, who performed his investigative duty diligently and whose testimony shows no indication of animus or prejudice. Since it does not appear that the process of law was actually impaired, or that the cause of defendant was prejudiced by the matter in question, we are satisfied that it does not necessitate a new trial.

Defendant also contends that he was prejudiced by the trial court's refusal to allow him to impeach the witness Escalera, who had acted as interpreter when defendant was first interviewed by the district attorney and who testified to the substance of the statement made by defendant at that time. On cross-examination Escalera was asked, "What was your occupation at the time you did the interpreting?" The People's objection to the question was sustained. Defendant's counsel argued that "under the circumstances I think the jurors might imply a certain amount of prejudice, or bias in the matter." According to his briefs defendant's counsel by this question sought to show that Escalera, at the time he interpreted, was a prisoner in the county jail and had an application for parole pending before the county parole board. Such board consisted of the district attorney, the sheriff and a chief of police; Escalera had been prosecuted by the deputy district attorney who prosecuted this case, before the judge who tried this case; Escalera was paroled after he interpreted defendant's statement and was still on parole at the time he testified. These facts might, in the opinion of a jury, show a reasonable basis for an inference that the translation and the testimony of Escalera were influenced by a hope that he would be leniently treated by the officials if he aided in the conviction of defendant. (*People* v. *Robles* (1868), 34 Cal. 591, 594; *People* v. *Pantages* (1931), 212 Cal. 237, 253-259 [297 P. 890] and cases there cited.) If Escalera had testified to a statement by defendant which differed disadvantageously in any material respect from defendant's testimony at the trial, then defendant might have substantial cause to complain of refusal to permit him to impeach Escalera by showing his possible motive. (Although the transcript does not show that a specific offer of proof was

made, the inference seems clear, from the context surrounding the question and objection and from the unchallenged statement in the briefs that the same judge tried Escalera, that the trial court knew what the question was designed to elicit.) But Escalera's testimony as to defendant's statement substantially and in all material respects accords with the testimony of defendant, given through another interpreter. Therefore, it does not appear how defendant's position would have been bettered by discrediting Escalera.

After examination of the entire cause we have concluded that the errors complained of by defendant have not resulted in a miscarriage of justice. (Cal. Const., art. VI, § 4½.) For this reason the judgment and order appealed from are affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Spence, J., concurred.