Filed 3/2/16  P. v. Jones CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>ROBERT WAYNE JONES,<br><br>          Defendant and Appellant. | A143839<br><br>(Napa County<br>Super. Ct. No. CR145094) |

The involuntary commitment of a mentally disordered offender may be extended for a year beyond termination of parole if a "court or jury finds that the patient has a severe mental disorder, that the patient's severe mental disorder . . . cannot be kept in remission without treatment, and that by reason of his or her severe mental disorder, the patient represents a substantial danger of physical harm to others . . . ." (Pen. Code,[1] § 2972, subd. (c).)  Here, a jury made these findings concerning defendant Robert Wayne Jones, whose commitment was so extended.  It has never been disputed that defendant satisfies the first criterion, that he does have a severe mental disorder.  Nor does defendant seriously controvert the third criterion, that he might constitute a danger to others.

This appeal is about the second criterion.  Defendant contends the jury's finding that his severe mental disorder cannot be kept in remission without treatment is infected with two instances of prejudicial instructional error.

---

[1] Statutory references are to the Penal Code unless otherwise indicated.

First, he argues that the trial court erred when it instructed the jury with CALCRIM No. 3457 advising only that the People have to prove that defendant's severe mental disorder "cannot be kept in remission without treatment," because "remission" is too simply defined as "mean[ing] that the external signs and symptoms of the severe mental disorder are controlled by either psychotropic medication or psychosocial support." Defendant contends this definition was inadequate, because the concept of remission is far more complex, as evidenced by the more detailed definition codified in another statute, which is incorporated in a part of CALCRIM No. 3457 the court refused to use. We conclude the error claimed did not occur. CALCRIM No. 3457 speaks in the disjunctive of a severe mental disorder that "is not in remission or cannot be kept in remission without continued treatment," and here the uncontradicted evidence was that defendant's severe mental disorder was not in remission. Therefore, the speculative issue of whether defendant's severe mental disorder could be kept in remission with treatment was not germane for the jury's consideration.

Second, defendant contends the court failed its sua sponte duty to instruct on what defendant calls "the medication defense as outlined in *People v. Noble* (2002) 100 Cal.App.4th 184." As will be shown, the "defense" of which defendant speaks is based on the predicate of the defendant suffering from a severe mental disorder which can be kept in remission with treatment. That predicate was inapplicable here because defendant's disorder was not in remission, so the issue of whether taking medication would keep him in remission could not arise.

In light of these conclusions, we affirm the order of commitment.

## BACKGROUND

Criminal proceedings against defendant were commenced in March 2009 when the District Attorney of Napa County filed a complaint by which defendant was alleged to have committed two counts of felony assault, one upon a peace officer (§ 245, subds. (a)(1), (c)); two felony counts of making criminal threats (§ 422); and one count of misdemeanor battery (§ 242). At the time defendant was the subject of a conservatorship under the Lanterman-Petris-Short Act (see Welf. & Inst. Code, § 5350 et seq.), and had

2

been for six years.[2]  He was placed at Napa State Hospital, and the charges related to his conduct with personnel at that institution.  Criminal proceedings were suspended the following month.  Defendant remained at Napa State Hospital—which the court authorized to administer psychotropic medication against defendant's will—or at Atascadero State Hospital.

Criminal proceedings were reinstated in November 2009. The following month the parties reached a negotiated disposition:  the misdemeanor battery count would be dismissed; one of the assault counts and the criminal threat felonies would be reduced to misdemeanors; defendant would plead no contest to the single felony assault count (§ 245, subd. (a)(1)) and the three remaining misdemeanors; and defendant would be sentenced to an aggregate term of three years in state prison.  Defendant was sentenced in accordance with this agreement in January 2010.

"Not later than 180 days prior to . . . release from prison . . . if the . . . prisoner's severe mental disorder is not in remission or cannot be kept in remission without treatment, the medical director of the state hospital . . . shall submit to the district attorney . . . of the county of commitment to prison . . . [a] written evaluation on remission." (§ 2970, subd. (a).)  "The district attorney may then file a petition with the superior court for continued involuntary treatment for one year." (*Id*., subd. (b).)  At the request of medical personnel at Atascadero State Hospital, whose evaluation concluded that defendant "represents a substantial danger of physical harm to others," the District Attorney of Napa County duly filed such a petition in July 2014.[3]

The jury was sworn on December 1, 2014; the trial commenced the following day, and concluded on December 3.  After the petition was read, the trial court instructed the jury with CALCRIM No. 3457.[4]

---

[2] The conservatorship was terminated in July 2009.

[3] Defendant's release date was January 3, 2015.

[4] "The petition alleges that Robert Jones is a mentally disordered offender.  To prove this allegation the People must prove beyond a reasonable doubt that:  One, he has a severe mental disorder; two, the severe mental disorder is not in remission or cannot be

3

The People's case-in-chief consisted of the testimony of two experts, psychologist Dr. Timothy Nastasi (who never treated defendant) and psychiatrist Dr. Mark Daigle (who did). Much of their testimony overlapped, was not in substantial dispute at trial, or is not material to the issues on this appeal. With these qualifications in mind, the following summary will suffice:

Both Nastasi and Daigle believed that defendant suffers from a severe mental disorder, specifically, schizoaffective disorder—which Nastasi called "a long-standing diagnosis"[5]—and as a result of that disorder represents a substantial risk of physical harm to others if released. In addition to delusions and auditory hallucinations, Nastasi identified "homicidal and suicidal ideation as part of his symptom[s] . . . where he gets intrusive thoughts of killing others or killing himself." And, he testified, defendant's disorder cannot be kept in remission without treatment.

Defendant is currently being medicated with the antipsychotic Clozaril, but he does not like it and would not take it if he were not subject to an involuntary medication order. When the order expired, and before it was renewed, defendant refused to take his medications and became threatening. In fact, during a period when defendant was refusing medication, he attempted to kill someone; he was charged, but that was eventually dropped because "he was too severely psychotic for that" and "because he

kept in remission without continued treatment; and, three, because of his severe mental disorder he presently represents a substantial danger of physical harm to others.

"A severe mental disorder is an illness or disease or condition that essentially impairs the person's thought, perception of reality, emotional process or judgment or that grossly impairs his or her behavior or that demonstrates evidence of an acute brain syndrome for which prompt remission in the absence of treatment is unlikely. It does not include a personality disorder or addiction to or abuse of intoxicating substances. Remission means that the external signs and symptoms of the severe mental disorder are controlled by either psychotropic medication or psycho-social support."

[5] Daigle testified that defendant has had the diagnosis for 20 years. Nastasi testified that defendant has also been diagnosed as having antisocial personality disorder, which is "not covered . . . by the mentally disordered offender statute." Daigle termed it "a mood disorder kind of heaped on top of" the schizoaffective disorder. Daigle also deemed the disorder pretty much synonymous with schizophrenia.

4

already had the mentally disordered offender" designation. Nastasi and Daigle testified that even with the Clozaril, defendant is not in remission.

According to Nastasi, "[t]he psychotic symptoms are typically more chronic[] even on medications." Defendant is also taking lithium and Haldol, another antipsychotic. Defendant will always need to take these medications; if he stopped, he would likely become "more aggressive and more and more violent."[6] Nastasi believed defendant would not take his medications if he was "outside of the hospital environment." Clozaril is "high maintenance" and "usually the last resort."[7] "[D]uring the past year he [defendant] has made threats of substantial physical harm and he has failed to voluntarily follow his treatment plan." Defendant has inconsistent "insight into his mental disorder and his need for treatment." This is significant because it correlates to his willingness to take his medication: "It's very unlikely that if an individual . . . doesn't believe he has a mental illness that he'll keep taking medications." "[F]or the most part his insight has been poor," but "I'm seeing signs that it's improving . . . ." As for defendant's "relapse prevention plan," Nastasi concluded "he doesn't have much of one right now . . . ." Asked if the issue of defendant's release was "a close call" for him, Nastasi gave an emphatic "[n]o."

Daigle testified that defendant has "got to take Clozaril. He just has to. [¶] . . . [¶] He's been tried on everything and nothing has worked . . . so all our hopes are on Clozaril to get him out." This because "Clozaril is the only mediation that has . . . shown to be better at reducing aggression than the other medications." And because "it would be a big deal if you started missing two or three days in a row . . . Clozaril . . . has to be prescribed in a setting that is fairly structured." "Compliance is a huge issue for most

---

[6] Nastasi testified that defendant "had two stints . . . where he . . . start[ed] refusing medication . . . and became aggressive again." Nastasi further testified that since 2009 there have been "27 incidents of violent or threatening behavior, 22 of which were physically assaultive."

[7] Daigle testified that after being "treated for 20 years . . . I can guarantee you, he's been on everything . . . ."

patients . . . ." And defendant "indicated to me personally that when he gets off the court order he's gonna stop the Clozaril . . . ."

Daigle was asked whether he thought it likely that defendant "will continue to take his medication if he's released from the hospital?" He answered, defendant "would be in the bottom half of those likely to continue their meds the way they're prescribed." If defendant lapses, "I think there would be a high likelihood that he would be aggressive in short order. [¶] It's been demonstrated over a fairly clear period of time that that's what occurs." In time, defendant might be able "to go into the LPS system, something like a locked skilled nursing facility, something like that where there's some control over his coming and going and I think then he'll be fine."

As may be deduced from this last answer, Dr. Daigle was a little more optimistic (or cautious) than Dr. Nastasi. Daigle refused to give an opinion as to whether defendant was dangerous. Defendant did not "appear to be resistant to the idea that he suffered from a mental illness," and accepted "the need for him to take medication to treat his illness." While Daigle was treating him, defendant never refused to take "his psychiatric medications." Yet when asked by the prosecutting attorney "is he ready to be released from the hospital now?", Daigle had to answer, "I don't think so."

The sole witness for the defense was defendant himself. As might be expected from the disorder as described by Drs. Nastasi and Daigle, defendant's testimony had moments of confusion and incoherence. Although he did seem to accept that he was suffering from a mental disorder, it is not clear from the transcript whether defendant truly appreciated suffering from visual and auditory hallucinations.[8] He acknowledged

---

[8] Defendant testified on direct examination that he was 20 when he was "first diagnosed with a mental illness" whose symptoms included "[g]randiosity" ("I would see God in everybody." "[J]ust in the eyes, I see children in everyone") and "euphoria." Defense counsel continued: "Q What are the other symptoms that you had as . . . your mental illness progressed? [¶] A Seeing things, flashbacks. [¶] Q Okay. So kind of like visual hallucinations? [¶] A Yeah. [¶] Q And can you tell that these things aren't real when they're happening? [¶] A No. [¶] Q Okay. And has it been a while since you had visual hallucinations? [¶] A I was in my room, the jail cell. [¶] Q Yes. [¶] A And the Godfather came to me. [¶] Q You knew that wasn't real, though, didn't you?

6

the need to keep taking his medications and would do so if released. Although Clozaril "mess me up" "I'll take it if I have [to]." He did not think he would benefit from remaining "in the hospital a little bit longer."

Defendant has a plan if he was released: "[W]hen it's time for me to start releasing and transitioning out I get a conservator and a place to go, so, say the court say I can go to Crestwood Sacramento, from there I get a conservator, she [defendant's mother] send me to Sacramento, she visit me once a month." [9]

Defendant admitted his assault conviction was for striking an officer in the chest with a piano bench when hospital personnel "were trying to give [him] an injection of medication." The year before, 2008, he struck a psychiatrist who called him a child

---

[¶] A Right. [¶] Q Okay. Have you ever heard voices? [¶] A Yeah, I can hear my father. [¶] Q Hear your father? [¶] A Sometimes I can hear my mother talking to me. [¶] Q And both of them are still alive? [¶] A Yes, sir. [¶] Q And when that happens do you know they're not there in the cell with you? [¶] A Yeah, I —yeah. It's like a— well, you want to know what time it is, you ask them what time it is and all the clocks get continued on the same and they say it's 9:25 and in England they will say straight up 9:00."

When asked on cross-examination about seeing the Godfather in his cell, defendant responded: "I could tell you, I'm crazy, I'm crazy and I'm retarded so I don't mind being locked in a safe facility, staying safe from the cops, safe. Crestwood Sacramento is a safe facility. You get baths instead of shower, very clean. They clip my nails every day or face lotion, splash on lotion." And later: "I don't think I have hallucinations because, look, I heard, you know, Big Hippie [Ozzy Osborne]. . . . When air is quiet and angels are not talking and people are, he pick quiet time and he sings beautiful, like real long song, he taught me how to do the guitar, yeah." Hearing his parents was his "sixth sense." Asked whether he would see a doctor or get "an adjustment of your medication" "if you started seeing God again," defendant replied that he would not seek medical assistance because "[a]s soon as you tell a doctor you see God . . . they lock you up. [¶] . . . [¶] If you see God or hear God I am, I am is God. Not me God, but I am, the burning bush I am. Yeah, Adam was a very nice guy, Nicholas Adams." "I never said it out loud that I was God. I've heard from people that I'm God." "There's people out there, people always say that."

[9] Defendant described Crestwood Sacramento as a privately owned mental health facility where defendant spent six months. He called the facility "a very nice place." His parents live in the Sacramento area. Defendant later testified that he would ideally like to live with his father, who suffers from schizophrenia.

7

molester. In 2010, he stabbed his cellmate in the neck with a pen. He told prison officials afterwards that the pen "came out the side of his neck and then I took out his fucking eye. I was afraid for my family and that's why I killed [*sic*] him." Defendant did not remember a number of incidents in 2012, which was "a hard year" for him. He did remember punching a staff member in 2013 for trying to take his temperature in a manner he found objectionable.

The prosecuting attorney asked: "You heard . . . testimony that you've been involved in approximately 22 physical acts of violence. Did you hear that testimony? [¶] A No, it was—that's wrong. It's not 22 individual acts. [¶] Q What would you estimate it at? [¶] A About 15 people wanted it. [¶] Q In just one day? [¶] A One day. Fifteen all on me at the same time. Five another day and two the day after that. [¶] Q So how many total physical incidents would you say you've had? [¶] A Twenty-two."

After being instructed again with CALCRIM No. 3457 (quoted at fn. 4, *ante*), and hearing brief argument from counsel,[10] the jury deliberated and returned its verdict that "Robert Wayne Jones has a severe mental disorder, that the disorder is not in remission or cannot be kept in remission without treatment and because of his severe mental disorder . . . Robert Wayne Jones presently represents a substantial danger of physical harm to others . . . ."

---

[10] The gist of defense counsel's argument was to concede that defendant "clearly has a mental illness," that it was not in "full remission," but "I think you can say it's in partial remission." "Which gets you to the question that really is the only one you have to answer here, is that does he represent a substantial danger of physical harm to others?" Dr. Nastasi's testimony was discounted because he never treated defendant, "he's not . . . spent any considerable [amount] of time with Robert, [and thus] he is not someone that can get some sense of what a person is like." The jury was urged to credit Dr. Daigle's belief that defendant "is one of those patients that could be talked into taking his medications because he understands that it has some benefits for him." Noting that defendant "hasn't hit anybody in almost two years," counsel concluded: "[I]f you look at Robert, at the moment he does not represent a substantial danger of physical harm to others."

## REVIEW

### CALCRIM No. 3457 As Given to The Jury Was Correct

As pertinent here, defendant's special instruction 31 read: "The term 'remission' means a finding that the overt signs and symptoms of the severe mental disorder are controlled either by psychotropic medication or psychosocial support. A person 'cannot be kept in remission without treatment' if during the year prior to the question being before the trial court, he has been in remission and he has been physically violent, except in self-defense, or he has made a serious threat of substantial physical harm upon the person of another so as to cause the target of the threat to reasonably fear for her or her [*sic*] safety or the safety of her or her [*sic*] immediate family, or he has intentionally caused property damage, or he has not voluntarily followed the treatment plan. In determining if a person has voluntarily followed the treatment plan, the standard shall be whether the person has acted as a reasonable person would in following the treatment plan."

The first sentence, which is identical to language in CALCRIM No. 3457, is without controversy. The remainder of the instruction largely tracks language in CALCRIM No. 3457 that was not used.[11] In discussing whether the jury should be instructed with the remaining language, defense counsel did not believe the first two particulars were supported by the evidence. In addition, defense counsel noted "there's been no evidence as to what his [defendant's] treatment plan was."

---

[11] "A severe mental disorder cannot be *kept in remission without treatment* if, during the period of the year prior to _____<*insert the date the trial commenced*> the person: [¶] <*Give one or more alternatives, as applicable.*> [¶] [1. Was physically violent except in self-defense; [or]] [¶] [2. Made a serious threat of substantial physical harm upon the person of another so as to cause the target of the threat to reasonably fear for his or her safety or the safety of his or her immediate family; [or]] [¶] [3. Intentionally caused property damage; [or]] [¶] [4. Did not voluntarily follow the treatment plan.]] [¶] [A person has voluntarily followed the treatment plan if he or she has acted as a reasonable person would in following the treatment plan.] [¶] [A *substantial danger of physical harm* does not require proof of a recent overt act.]" (CALCRIM No. 3457 (2015) pp. 976–977, bold type omitted.) This language derives from subdivision (a)(3) of section 2962.

The court then inquired: "Why does this section even need to be given?" The court went on the explain, "I guess what I'm saying is [defense counsel's] taken the position that you just don't give that segment that's that specific about whether a disorder cannot be kept in remission . . . . [E]lement two says the mental disorder is not in remission and cannot be kept in remission without continued treatment. Both doctors have testified that that's the case. I guess my question is why do you need an instruction that's really specific about what constitutes remission or not in remission when you've got two experts who have said he's not in remission and won't be in remission without further treatment?"

Consulting the bench notes to CALCRIM No. 3457, the court commented: "I'm looking at it. Basically it says one published case has said in dictum that, quote, the option of, quote, cannot be kept in remission without treatment requires a further showing that the prisoner within the preceding year has engaged in violent or threatening conduct or has not voluntarily followed the treatment plan. That's *Buffington*, 74 Cal.App.4th, 1149. And that was an SVP [sexually violent predator] case. So I tend to think that this language is surplusage. [¶] . . . [¶] So my thought would be I would give 3457, I would delete the bracketed portions about a severe mental disorder cannot be kept in remission without treatment and the different examples."

The prosecuting attorney inquired: "And then I can just argue why that was their opinion." The court replied: "Right. So and then I would give the rest of 3457.[12] [¶] And then 3550 ["Pre-Deliberation Instructions"]. Okay?" Defense counsel stated, "That's fine."

Defendant sees the omission as error, arguing as follows: "In order to prove that appellant was an MDO, the government was required to prove either that he was not in remission or that he could not be kept in remission without treatment. Even though the

---

[12] To wit: "You will receive a verdict form on . . . which to indicate your findings, whether the allegation that Robert Jones is a mentally disordered offender is either true or not true. To find the allegation true or not true you all must agree. You may not find it to be true unless you all agree that the People have proved it beyond a reasonable doubt."

standard CALCRIM instructions included the definition of the term 'cannot be kept in remission without treatment' the trial court inexplicably and deliberately chose not to give this instruction. This was error. [¶] The error was prejudicial because the jury could have determined that the government had failed to prove that appellant was not in remission but the un-contradicted testimony of the witnesses was that he could not be kept in remission without treatment."

To the contrary, the trial court's reasoning is plainly and entirely explicable. CALCRIM No. 3457 explains the various statutes specifying that a person must be suffering from a severe mental disorder that either "is not in remission or cannot be kept in remission without treatment." (See §§ 2962, subd. (a)(1), 2970, subd. (a), 2972, subd. (c).) Here, as noted by the trial court, both Dr. Nastasi and Dr. Daigle held the opinion that defendant was not in remission. Thus, on this point the evidence was not in dispute. The part of CALCRIM No. 3457 not used addressed the other inquiry of determining how and whether defendant qualified for release. In other words, it addressed a nonissue.

Indeed, it almost certainly would have been error to have instructed the jury with the omitted parts of CALCRIM No. 3457. As defense counsel noted, there was not substantial evidence showing the existence of three of the four criteria (i.e., self-defense, making a serious threat, or not following the treatment plan) used. The fourth and final criteria—intentionally causing property damage—was never at issue. (See *People v. Burroughs* (2005) 131 Cal.App.4th 1401, 1407 ["[S]ection 2962, subdivision (a) . . . . defines the phrase 'cannot be kept in remission without treatment' to mean that one of four specified acts have occurred during the previous year . . . ."].) Thus, the omitted language addressed situations that were not presented. Using that language could not be justified. (*People v. Cross* (2008) 45 Cal.4th 58, 67 ["Giving an instruction that is correct as to the law but irrelevant or inapplicable is error."]; *People v. Rowland* (1992) 4 Cal.4th 238, 282 ["It is error for the court to give an 'abstract' instruction, i.e., 'one which is correct in law but irrelevant[.]' "]; *People v. Rollo* (1977) 20 Cal.3d 109, 122–123 [" 'It is error to give an instruction which correctly states a principle of law which has no application to the facts of the case.' "].)

"[A] trial judge should be diligent in refraining from burdening the jury . . . with inapplicable instructions . . . ." (*People v. Sanchez* (1947) 30 Cal.2d 560, 572.) The trial court here was precisely that.

### There Was No Sua Sponte Duty to Instruct On the Burden of Proving Defendant Would Take Medication

As already shown, the jury was twice instructed with CALCRIM No. 3457 that the People had the burden of proving the allegation of its petition "that Robert Jones is a mentally disordered offender. To prove this allegation the People must prove beyond a reasonable doubt that: One, he has a severe mental disorder; two, the severe mental disorder is not in remission or cannot be kept in remission without continued treatment; and, three, because of his severe mental disorder he presently represents a substantial danger of physical harm to others." Defendant contends the court had the additional sua sponte obligation to instruct that the People also had to prove beyond a reasonable doubt that defendant would not take his medication if released. We do not agree.[13]

Defendant's argument is based on *People v. Noble*, *supra*, 100 Cal.App.4th 184, in which the trial court instructed the jury that the People had the burden of proving the elements necessary for an MDO extension beyond a reasonable doubt, but then undercut that instruction with former CALJIC No. 4.15 (now renumbered CALJIC No. 4.17.1[14]), which was derived from case law involving petitions to extend a commitment of not guilty by reason of insanity under section 1026.5. (*People v. Noble*, *supra*, at pp. 189–190.)

The Court of Appeal in *Noble* concluded that CALJIC No. 4.15 had no place in an MDO proceeding, in which a defendant's claim that his disorder was controlled by

---

[13] It is also questionable whether defendant correctly identifies the matter of medication as a true defense. The claim that medication controls a severe mental disorder appears to challenge the "substantial danger of physical harm" element. So viewed, instruction on that claim would appear to qualify as a pinpoint instruction which is to be given only upon request by the defense. (*People v. Noble*, *supra*, 100 Cal.App.4th 184, 189.) This is a point we mention, but obviously do not decide.

[14] There is at present no CALCRIM equivalent.

medication was a challenge to one of the necessary elements for a commitment, rather than an affirmative defense. (*People v. Noble*, *supra*, 100 Cal.App.4th 184, 189.) When the trial court instructed the jury that the defendant had the burden of proving he would continue to take his medication, this shifted the People's burden of proving he represented a substantial danger of physical harm to others. (*Id.*, at pp. 189–190.) This was an error that could not be deemed harmless beyond a reasonable doubt.

But the issue of whether a parolee would take his or her medication following release obviously assumes release. Here, such a prospect for defendant is not imminent because his severe mental disorder is not in remission. The question of whether he would or would not take his medications following release, or which party would have the burden of proof on that issue, is irrelevant at this stage of his recovery. According to the authorities cited already, it would therefore have been error for the jury to have been instructed on this question. It naturally follows that there was no sua sponte duty on the part of the trial court, and consequently no failure to discharge that duty. It further follows that defendant's trial counsel was not ineffective for not asking the court to use an inapplicable instruction.

## DISPOSITION

The order of commitment is affirmed.

13

_____
Richman, J.

We concur:


_____
Kline, P.J.


_____
Miller, J.


A143839; *People v. Robert Wayne Jones*